## Case No. 262.

### ALSOP v. COMMERCIAL INS. CO.

[1 Sumn. 451.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1833.

MARINE INSURANCE—WAGER POLICY—OVER-VALUATION — NEW TRIAL — CUMULATIVE EVIDENCE— CROSS-EXAMINATION

1. A policy of insurance underwritten for $10,000 on profits on merchandise on board the brig Leonora at and from Callao to Baltimore, free of average and salvage, and the policy to be the only proof of interest required, is not in our law to be deemed a wager policy, where the assured had property on board, and neither he nor the underwriters intended to insure up-

¹[Reported by Hon. Charles Sumner.]

on a wager policy, but intended it as a policy on interest.

[Cited in Merrill v. Arey, Case No. 9,468.]

2. There cannot, strictly speaking, be a gaming policy under our law, unless both parties intend to game or wager.

[Cited in Merrill v. Arey, Case No. 9,468.]

3. If one party intending a gaming or wager policy, procures it to be underwritten by the other, as a policy substantially on interest, and thus designedly misleads the latter, the policy is void for fraud.

4. But, if both parties intend a policy on interest, and the assured has a substantial interest in the property on board, and there is an over-valuation of the property made bona fide, and not with an intention to mislead or defraud the underwriter, the policy is good.

[Cited in Clark v. Manufacturers' Ins. Co., Case No. 2,829.]

5. If an over-valuation of the property insured be made with an intent to defraud or mislead the underwriter, the policy is void. But if it be bona fide made, and without any intention to defraud or mislead the underwriter, and the party has a substantial interest, the policy is good. In the latter case, if the underwriter agrees to the valuation, he is estopped to go into the consideration of the actual value.

[Cited in Clark v. Manufacturers' Ins. Co., Case No. 2,829.]

6. If a party insures property, expected to be on board a ship to a large amount, upon a valued policy, and much less is in fact shipped, he is entitled to recover in case of a loss a proportion pro rata only, notwithstanding the valuation.

[Cited in Clark v. Manufacturers' Ins. Co., Case No. 2,829.]

7. In what cases the court will interfere with a verdict upon matters of fact, and especially where fraud in fact is in issue, by granting a new trial.

[Cited in Fearing v. De Wolf, Case No. 4,711; Whetmore v. Murdock, Id. 17,509; Macy v. De Wolf, Id. 8,933; Aiken v. Bemis, Id. 109; Blanchard's Factory v. Jacobs, Id. 1,520. Followed in Fuller v. Fletcher, 6 Fed. 129. Approved in Hunt v. Pooke, Case No. 6,895.]

8. A new trial will not be allowed merely to let in new cumulative evidence to points made at the trial.

[Cited in Ames v. Howard, Case No. 326; Fearing v. De Wolf, Id. 4,711; Whetmore v. Murdock, Id. 17,509; Macy v. De Wolf. Id. 8,933; Aiken v. Bemis, Id. 109; Blanchard's Factory v. Jacobs, Id. 1,520; Vose v. Mayo, Id. 17,009. Followed in Fuller v. Fletcher, 6 Fed. 129. Approved in Hunt v. Pooke, Case No. 6,895.]

9. An objection was taken to a direct interrogatory, and the answer to it, at the time of taking the deposition, which was supported by the court at the trial, and the answer ruled out; held, that the answers to the cross interrogatories, which did not on their face purport to be asked in consequence of the direct interrogatory, and were not made dependent upon it, are admissible as evidence.

At law. Action upon a policy of insurance, underwritten by the defendants, dated the 19th of August, 1831, whereby the plaintiff by his agent, Zebedee Cook, Jr., was insured "ten thousand dollars on profits on merchandise on board the brig Leonora, at and from Callao to Baltimore, free of aver-

age and salvage, and the policy to be the only proof of interest required," at a premium of one and a half per cent., the profits being valued at $20,000. There were shipped on board the Leonora at Callao, for the account of the plaintiff, bullion of the invoice value of $11,821, and California hides of the invoice value of $7,765. The Leonora is admitted to have sailed on the voyage and to have been lost by the perils of the seas, she never having been heard of since her departure from Callao. At the trial there was a verdict for the plaintiff for the whole amount insured. A motion for a new trial was made for several reasons stated in a written application to the court. Those that were finally insisted on will appear in the opinion of the court.

Aylwin & Webster for plaintiff.

Charles G. Loring and J. Mason for defendants.

STORY, Circuit Justice. This case has been argued upon a motion for a new trial, for reasons stated in the written application to the court, upon which I have no more to observe, than that it is not to be taken for granted, that they present a full and accurate view of the whole case, or of the principles of law involved in the charge of the court. They are to be taken merely as suggestions. which, according to the practice of this court, counsel are authorized to make for the purpose of bringing the matter in review before the court. If there has been any material mistake in point of law, prejudicial to the defendants, they are entitled to a new trial to correct it. If, on the other hand, there has been a failure to try the cause upon its fair merits in point of fact, and there has been a clear miscarriage by the jury, the same result will follow.

The first point now insisted upon for a new trial, (for several of those which are stated in the written motion have been waived,) is, that the court permitted certain parts of the deposition of Edwin Bartlett, which were objected to by the defendants, to be read in evidence to the jury. In the direct examination of Bartlett the plaintiff put the following interrogatory: "Did, or did not, the house of Alsop & Co., in the month of March, 1831, inform said Richard Alsop, that they intended to make shipments to him on account of those funds? If so, by what opportunity or vessel?" Upon an objection taken by the defendants to this interrogatory, and the answer to it, at the time of taking the deposition. and now insisted on, upon the ground, that the one asked, and the other stated the contents of written correspondence, which ought to have been produced, as the best evidence, the court sustained the objection, and overruled the interrogatory and answer. In the cross examination the defendants put the following interrogatories: (1.) "What was the nature of the orders of Mr. Alsop to remit funds

in your hands? Annex such orders, or state their contents." (2.) "Had the said Richard Alsop given any orders or instructions for the purchase and shipment of said hides? or were they purchased by the house to be sent to him in payment of the balance due him?" (3.) "Were any letters written by you, or any members of the firm of Alsop & Co., to Mr. Alsop concerning the proposed shipment by the Leonora? If yea, annex copies thereof, or state the contents, as accurately as possible." These cross interrogatories were fully answered by the witness; and the plaintiff proposed to read these answers to the jury, to which the defendants objected, upon the ground, that they were asked de bene esse only, upon the supposition, that the direct interrogatory and answer might be ruled in as evidence by the court. The court overruled the objection, and admitted these answers in evidence. And this ruling now constitutes the material point of this exception of the defendants.

The argument now is, that the objection was well taken at the trial; that the defendants had a right to ask the questions conditionally; and that the answers could not be admissible evidence against them, unless the objection to the direct interrogatory had been overruled. And it is urgently pressed, that otherwise the defendants would be put in peril, by being compelled to make an election at the time, when the deposition is taken, whether to rely upon their original objection, or to insist upon the cross interrogatories being answered. This exception is confessedly new in its form and presentation. No authority is adduced in support of it; and it must, therefore, be decided upon principle. I have reflected much upon it, and am perfectly clear, that it has no solid foundation in the law of evidence, as administered in this country or in England. In the first place, there can be no doubt, that generally the answers to cross interrogatories are admissible evidence in favor of the other side. If a party chooses to ask questions, and the answers are unfavorable to him, he cannot insist upon removing them out of the cause; and, if they are in his favor, insist upon them, as evidence. The law knows of no such principle of evidence, and it would, if adopted, be most pernicious in the administration of justice. There is no more reason, that the answer should be excluded, if asked upon the cross examination, than there would be to exclude it upon the direct examination. The plaintiff might with quite as much justice insist, that an answer to a direct interrogatory should not be evidence, because it was to meet some expected evidence on the other side, and happened to be unfavorable to him, as the defendants might insist, that the answers to their cross interrogatories should, under like circumstances, be suppressed. The law recognises no such principle. Each party asks all questions at his peril; and he must take the answers, if

they respond to the question, for good or for evil. They are in the cause; and it is not for the party, who brought them there, to insist upon their incompetence.

But, in the present case, the foundation, on which the argument rests, does not sustain it. Suppose the direct interrogatory had been originally suppressed, and never answered; could there be a doubt, that the answers to the cross interrogatories would be good evidence, if these interrogatories had been retained in the cause? I think there could be no doubt in such a case, without disturbing the first elements of evidence. Now, in point of fact, the present cross interrogatories were never withdrawn, before the answers were given, or afterwards. They do not on their face purport to be asked in consequence of the direct interrogatory, or the answer to it. They have no reference whatever to that interrogatory or the answer. They are not in their form put de bene esse, or hypothetically. They are not (as they ought to have been, if intended to be so put,) drawn in a form, which would exclude them from the deposition, if the direct interrogatory should be suppressed. They are not, directly or by consequence, attached to or dependent upon it. On the contrary, they are independent, substantive interrogatories, which the defendants had a right to put, whether the direct interrogatory were in or out of the deposition. Suppose the answers had been favorable to the defendants, I should be glad to know, upon what plausible ground the court could now exclude them. Could the court have said; You probably intended to put these cross interrogatories, only because the plaintiff had asked the direct interrogatory; and as that is excluded, you shall not have the benefit of your cross examination? Certainly not. The defendants, not having in terms so limited the application of their interrogatories, and not having in terms made them dependent upon the direct interrogatory, could not have been shut out from the evidence of the answers elicited upon their cross examination. And if the defendants could not, how can the court, consistently with any principle, shut them out from the plaintiff? If the answers would be evidence for either party, they must be for both. The competency of the evidence depends upon its nature, and not upon the side, in whose favor it makes, after it is introduced. Judicially, it is impossible for me to say, that the defendants did ask these interrogatories solely on account of the direct interrogatory. They are perfectly pertinent to the cause, if that be struck out; and indeed, in my humble judgment, of just such a nature, as ought to have been asked, not de bene esse, but absolutely, to eviscerate the very truth upon a point important to the defence. But it is sufficient for me to say, that the cross interrogatories, not being in fact made

in the record dependent upon the direct interrogatory, they stand like all other cross interrogatories, upon the general principles of evidence. There is no peril or mischief to the party in this result. If he chooses, he may make his cross interrogatories dependent; and then, whether favorable or unfavorable, the answers follow the fate of the direct interrogatory. And I cannot but think, that a different decision in this case would exceedingly perplex and impair the due administration of justice. It would enable a party to ask all sorts of questions in a general shape, relative to any matters in any antecedent objectionable interrogatory, and then to use them as evidence, if in his favor; and if otherwise, to exclude them from the use of his adversary. It would compel the court to search out the motives of all the cross interrogatories, and conjecture their object, instead of acting upon their terms and import. If a party, by cross examination of an incompetent witness on the general merits, after his incompetency is known, makes him a good witness, a fortiori a party asking a competent witness a general independent question, makes him a witness to that point.[2]

The next point is, that the court instructed the jury, that the representation made by the plaintiff to the defendants was sufficient to put them upon inquiry as to the time of the arrival of the Benezet, and that having other means to inform themselves, they were bound to make use of those means, if they thought the fact material; and that by omitting to do so, and underwriting the policy, they waived the right to receive information. Now, in order to understand the proper bearing of this exception, which does not fully and correctly state the charge of the court, it will be necessary to state some of the facts and proceedings at the trial, and the charge of the court upon this particular point. The policy was procured to be underwritten through the instrumentality of Mr. Cook, an insurance broker, who at the time of procuring it showed the underwriters a copy of his letter of instructions, and said he knew nothing more. It was in these words: "Zebedee Cook, Jr., Richard Alsop of Philadelphia. $10,000 on profits on merchandise on board the brig Leonora, (Weighmar master,) at and from Callao to Baltimore, free of average and salvage; and the policy, in the case of loss, to be the only proof of interest required. The Leonora sailed about the 12th of April, supposed direct for Baltimore. The ship Alfred sailed, ostensibly for New York direct, some days before the Leonora, and has not yet arrived.

[2] Sutton Coldfield Corp. v. Wilson, 1 Vern. 254; Charitable Corp. v. Sutton, 2 Atk. 402, 403; Jackson v. Son, 2 Caines. 178. But see Moorehouse v. De Passou. 19 Ves. 433, 434, Coop. 300; Vaughan v. Worrall, 2 Madd. Ch. 322; Bland v. Archbishop of Armagh, 3 Brown, Parl. Cas. 620.

The Benezet arrived at New Bedford, and sailed after the Leonora. The Leonora is a small brig, and not old,—I believe not five years,—and is considered in excellent order." In point of fact, the Leonora sailed on the 15th of April, three days later than was here supposed; and the Benezet arrived at New Bedford on the 15th of July, 1831; and her arrival was reported in the Boston Commercial Gazette, a newspaper taken at the insurance office, on the 18th of the same month, as follows: "Arrived at New Bedford, 15th, the brig Benezet, Sherman master, Callao, April 20th. Brig Leonora, &c., sailed about a week previous." Now, upon this posture of the facts, it was contended by the defendants, first, that there was a misrepresentation of a material fact, namely, the arrival of the Benezet, which was represented by the letter as having recently arrived, whereas she had been in port thirty-three days; secondly, that if not so, there was a concealment of a material fact, namely, the time of arrival of the Benezet. Upon these points the court directed the jury as follows: That a misrepresentation or a concealment, to avoid the policy, must be of some fact, material to the risk, and important to guide the underwriter, not only as to the premium he should ask, but also whether he should underwrite at all. In regard to a concealment, there was this additional ingredient, that the fact must be of such a nature, as that the underwriters must be presumed to trust to the assured for information respecting it; and the concealment must be of facts not equally open to the knowledge of both parties, but peculiarly or exclusively within the knowledge of the assured. Facts of a public nature, such as the length of voyages, the course of trade and navigation, the chances of peace and war, the different effects of different seasons of the year on the risk, and other circumstances of a political or general nature, however material they might be to the risk, were supposed to be equally within the reach of both parties; and therefore the assured, even if he had superior skill, was not bound to disclose any thing respecting them. The underwriters are not presumed to trust him in such matters, but to rely on their own means of information and judgment.

Then, as to the first inquiry; Was there any misrepresentation, as to the fact of the Benezet's arrival? The words of the paper of instruction are: "The Benezet arrived at New Bedford, sailed after the Leonora." The argument insists, that the meaning is, that the Benezet has recently arrived; and it is this recency of arrival, that constitutes the very gist of the misrepresentation; for unless it is contained in the instructions, directly or by implication, so as to lead the underwriters to that conclusion, as a matter of affirmation by the plaintiff, the objection is gone. Now, it is most material to state, that there is no such word as "re-

cently" in the paper of instructions. The words are not, "The Benezet, recently arrived at New Bedford, sailed," &c.; but "The Benezet arrived at New Bedford, sailed," &c. So that there is no pretence of an express averment of the recency of her arrival. Is it implied in the language? I cannot say, that it is. She had actually arrived; and it is quite consistent with the other parts of the paper, that it should intend no more than to refer to the fact of her arrival, as one either actually or presumptively within the knowledge of the underwriters; and that it was introduced, not for the purpose of referring to the true time of her arrival, but for another fact, which might not be as well known to the underwriters, namely, that she sailed after the Leonora. It ought to be a very strong case, which should induce either a court or a jury to interpolate a word in a sentence, which is not necessary to make it sensible, or which is not fairly and clearly implied by the nature of the terms used. It should also be considered, that the plaintiff is resident in Philadelphia; and New Bedford is in the immediate neighborhood of Boston, and there is a daily mail between these latter places, and a daily report in the newspapers of both places (as the evidence shows) of all arrivals at the respective ports; and that it is usual for the presidents of insurance offices to examine the newspapers for this purpose. And in point of fact, the daily newspaper, taken by the defendants, did contain the very information, as to the time of the arrival of the Benezet. What could be more natural, then, for a person desirous of procuring insurance in Boston, than to presume the underwriters acquainted with arrivals at Boston, and the neighboring ports, it being usual to publish such facts, and for the underwriters to take notice of them? Under such circumstances, I put it to the jury to say, whether the plaintiff did intend to affirm any thing by implication as to the arrival of the Benezet being recent, or whether he only referred to the fact of her arrival, as being within the knowledge or means of knowledge of the underwriters, as well as of himself, for the purpose of stating that the Benezet sailed after the Leonora. If they should think that there was an averment, that the Benezet had recently arrived, and that the fact thus stated was material to the risk, then their verdict should be for the defendants; if otherwise, then there had been no misrepresentation affecting the policy.

Then, as to the concealment, the charge was to this effect: The concealment, as had been already stated, must be of a material fact, peculiarly within the knowledge of the party, and in respect to which the other party may be presumed to trust him; and not of such public facts as may be presumed to be equally open to both parties. Now, there was clearly no concealment of

the fact, that the Benezet had arrived, or of the port (New Bedford) at which she had arrived, which is in the neighborhood of Boston, and much nearer· to that place than to the plaintiff's residence. And in this part of the case, then, there is no room for any argument about recency of arrival. The concealment is argued to be of the fact of her having arrived thirty-three days before. In the first place, was not this a fact, under the circumstances, equally open to the inquiry and ascertainment of both parties? Was it not a fact of general notoriety, and capable by the slightest diligence of being as easily ascertained by the underwriters, as by the plaintiff? The information given was sufficient to put the defendants upon inquiry, if they had chosen to do so. They asked no farther information of the fact, and they made no farther search. If the time of arrival was at all material, was it not their duty then to make it? I think it was. The notice to them was sufficient to put them upon inquiry; and they must be presumed to have notice of all facts, which under such circumstances they might reasonably know. In the next place, was the fact of such a nature, as that the defendants could be presumed to trust the plaintiff in regard to the fact? Or could he fairly be presumed to believe, that they trusted him in regard to it? Did the plaintiff intend to put them upon inquiry, or to give them notice to rely upon their own knowledge of the time of arrival of the Benezet, by the ordinary means, by which such arrivals are usually known? If so, it does not seem to me, that the defendants can now fairly turn round, and accuse him of a material concealment of a fact open to both parties, and as to which they did not trust to his knowledge, but relied upon themselves. But was the fact itself material? And if material, how far was it material? The representation was, that the Leonora sailed on the 12th of April, which was three days earlier than the time of her actual sailing. So that at the time of insurance she was represented as being out 129 days, whereas she was out only 126 days. Now, the time of the arrival of the Benezet could be no otherwise material, than with reference to the fact, whether the Leonora was out of time or not. This was a matter upon the facts so disclosed perfectly open for both parties to consider and decide upon. The underwriters are bound to know the ordinary length of passages and voyages, the seasons of the year, and the common causes, which may retard or accelerate a voyage. When the facts are given, they are bound to know, and decide for themselves, whether the vessel is out of time or not. The assured is not bound to disclose to them his opinion upon that matter. Mr. Cook stated at the trial, that he did not think the Leonora out of time, and that the ordinary passage is

from 120 to 130 days; other witnesses think the ordinary passages somewhat less; and one in particular says, that it is from 110 to 120 days. The only bearing of the time of the arrival of the Benezet was, as a collateral fact aiding or repelling the conclusion, as to the length of common voyages, and as to the Leonora being or not being out of time. For, as she sailed after, and not with, the Leonora, there was no necessary connexion in regard to winds, and weather, and passages, between them. Under such circumstances, it seems to me, that there was no concealment on the part of the plaintiff, which could affect the policy. The defendants were fairly put upon inquiry and the exercise of their own judgment; and they cannot now complain, that they did not examine or inquire farther. Their conduct amounted to a waiver of it.

Such was the substance of the charge on this point; and upon mature deliberation, I adhere to it. No case has been cited, which propounds a different doctrine; and it seems to me, that it stands confirmed by the general principles of the adjudged cases on the subject of notice, and especially by those, which have been decided in regard to concealment in cases of policies. The doctrine in Fort v. Lee, 3 Taunt. 381, is far more strong; for there it was held, that it was not necessary for the assured to discover to the underwriter, whether a vessel, sought to be insured at and from a port, had sailed or not. The court said: If the underwriter had wanted to know the fact, he ought to have inquired. I am, therefore, of opinion, that this exception ought to be overruled.

The next exception is, that the court instructed the jury, that there could not be a gaming policy within the meaning of the law of Massachusetts, unless both parties intended it as such. The charge of the court upon this point was to the following effect:—There cannot, strictly and abstractly speaking, be a gaming policy or other gaming contract under our law, unless both parties concur in the object. For if one intends to game, and the other does not, they do not, strictly speaking, come ad idem; and to form any contract, there must be a deliberate assent by both parties to the same thing. In the present case it is agreed on both sides, that the defendants never intended to enter into a gaming policy; and therefore it seems to me, that in a strict sense it cannot be treated as a gaming contract. But I do not think this is of any real importance in the cause, because if, as is conceded, the defendants did intend only to· underwrite a policy substantially on interest, and they have been misled by the plaintiff to underwrite one not upon interest, it is in construction of law a fraud upon them, and the policy is void. On the other hand, if both parties intended bona fide a policy on interest, and the plaintiff had a substantial interest on board, and the overvaluation was bona fide made, and not with

an intention to defraud or mislead the defendants, then the policy is good, and the plaintiff is entitled to recover. The question, then, in this aspect, resolves itself into two points; first, whether there has been a great over-valuation of the profits upon the property on board; and if so, secondly, whether it was bona fide made, or for the purpose of fraud or deception. If the plaintiff intended it to be a gaming policy, and concealed it from the defendants, it is void, not as a gaming policy, but as a fraud. Such was the charge.

Was the court wrong, then, in saying, that the policy was not a gaming policy, in a strict sense, under the law of Massachusetts? It is clear, that the law of this state must govern in this case; and I confess, that I am unable to perceive any error in this part of the charge. To form a contract, both parties must concur in ,the same purpose. A gaming contract ex vi terminorum is a contract, in which both parties agree to game. And here both parties never intended to game. This is admitted. How, then, could the court hold a different language, without overturning the first element of all contracts, mutual consent in the same thing?³ But let us see, what contracts are deemed by the law of Massachusetts gaming contracts. The statute of March 4, 1786, (St. 1785, c. 58,) declares, "that all notes, bills, bonds, judgments, mortgages, or other securities or conveyances whatsoever, given, granted, drawn, entered into, or executed by any person or persons whatsoever, where the whole or any part of the consideration shall be for any money or other valuable thing whatever, won by gaming, or playing at cards, dice, or any other game or games whatsoever, or by betting on the side or hands of any person gaming, or for the reimbursing or repaying any money, knowingly lent or advanced at the time and place of such play to any person or persons so gaming or betting, or that shall during such play so play or bet, shall be void, and of no effect." It afterwards provides for the recovery back of money lost at play; and also inflicts penalties on the winner or person taking such security. Now, it is most manifest, that a policy of insurance entered into without interest is not a gaming contract or security within the purview of this act. It is neither within the words nor within the intent. And there is no statute of Massachusetts, which does prohibit gaming policies in terms. If prohibited at all, they are prohibited solely by the common law. And so was the doctrine of the supreme court of the state. in Amory v. Gilman, 2 Mass. 1.

It is true, that, in a loose sense, a policy underwritten knowingly by both parties without interest, is among us sometimes spoken of, both at the bar and on the bench,

as a gaming contract. But this is not perfectly correct in legal language. It is more properly called a wager policy, at least in the sense of our law, where the word "gaming" has a limited and distinctive sense in the statute book.⁴ And accordingly in Amory v. Gilman, 2 Mass. 1, the court uniformly treat a policy without interest, as a wager policy, and give it that appropriate appellation. Nor is this a mere criticism upon language; for no one could pretend, upon sound reasoning, that a wager did not purport a unison of opinion and agreement of both parties to the same thing. A wager on one side would be a novelty in jurisprudence. The very form of a declaration on a wager demonstrates the truth, that the contract must involve a mutuality of consent, as to the wager and the risk run.⁵

If we pass to the jurisprudence of England, we shall find the same distinctive appellation applied by elementary writers, by the bar, and by the bench, to characterize policies without interest.⁶ Gaming is a species of wager; but in a strict sense all wagers are not gaming contracts, though they are often figuratively so called. Marshall and Park entitle their chapters on policies without interest, as wager policies.⁷ The statute of 19 Geo. II. c. 37, after reciting, that policies without interest have been productive of pernicious practices, and have introduced "a mischievous kind of gaming," proceeds to declare, "that no insurance shall be made on any ship, &c., or any goods, &c., interest or no interest, or without further proof of interest than the policy, or by way of gaming or wagering, or without benefit of salvage to the insurer; and that every such insurance shall be void."⁸ But the statute does not apply to insurances for foreigners. It is doubtless with reference to the very language, as well as the objects of this statute, that the bar and bench sometimes speak of policies without interest, as gaming policies. But (as I have said) the general and more exact appellation is wager policies. Thus, in the case of Kulen Kemp v. Vigne, 1 Term R. 304, where the policy was without interest, Lord Mansfield said: "This is a wagering policy." Mr. Justice Ashhurst used similar language. And Mr. Justice Buller said: "Policies are of two sorts, either upon interest, or by way of wager." "This is a wagering policy." And again in Da Costa v. Firth, 4 Burrows, 1966, 1969, which was a policy not within the statute, Lord Mansfield said: "It is a mixed policy, partly a wager policy, partly an open one; and it is a valued policy, and fairly so, without fraud or misrepresentation. There-

---

¹ See Wolcott v. Eagle Ins. Co., 4 Pick. 429, 437.

⁴ See 3 Kent, Comm. (2d Ed.) Lect. 48, p. 275.
⁵ See Kent v. Bird, Cowp. 583.
⁶ 1 Marsh. Ins. bk. 1, c. 4, § 2: Park, Ins. c. 14.
⁷ Marsh. Ins. bk. 1, c. 4.
⁸ Id. (2d Ed.) p. 127, § 2.

fore, the loss having happened, the insured is entitled to recover, as for a total loss. The insurer agreed to the value, and is concluded to dispute it."[9]

I do not mean to deny, that policies not on interest are sometimes called gaming policies, though they are more generally called wagering policies.[10] But what I do mean to assert is, that, whether the one phrase or the other is used, it imports the same thing, that is to say, that the parties mutually and knowingly consent to the gaming or wager; and that there cannot be a gaming or a wagering policy without such mutual consent. In all the cases in England on the subject of wager policies it will be found, that the contract either included in its terms the prohibited stipulations of the statute of Geo. II. c. 37, as to interest, or no interest, &c.; or that other equivalent words were used in the policy. The principle of law in England is, that every policy is to be deemed a policy on interest, unless it appear otherwise on the face of it. Lord Chief Justice Mansfield, in delivering the opinion of the court of exchequer chamber, in the case of Cousins v. Nantes, 3 Taunt. 513, 523, said: "Every policy must be taken to be a policy on interest, unless something be stated showing the contrary." There is this difference between policies in America and policies in England, containing stipulations, like those in the present policy, "interest or no interest," or "without farther proof of interest than the policy," that in the latter country, such policies being prohibited as wager policies, the insertion of the prohibited words in the policy is proof de facto, that they are mere wagers; whereas in America such policies are not treated as necessarily purporting to be wager policies; but they are deemed policies on interest, if the parties so understood, and agreed. So it was held in Amory v. Gilman, 2 Mass. 1, and in Clendining v. Church, 3 Caines, 141. Prima facie they so import; but the implication may be rebutted by proofs or admissions.

Now, in the present case, it is (as I have already stated) admitted, that the defendants meant to enter into a policy on interest, and not into a wager policy. They did not intend to wager or game, but to insure substantive interests. Whatever, then, the terms used are, the policy is to be deemed in point of law an interest policy. The plaintiff insists, that he meant it to be an interest policy; and if he had a substantive interest on board the ship, capable of being insured, I cannot perceive upon what principle the defendants can now treat it as a gaming policy. The policy was a wager policy, as to both parties, or as to neither party. It has not a double character, as a

policy on interest as to one, and not as to the other. If it be a policy on interest, then undoubtedly the plaintiff cannot recover, unless he shows an interest; for, in Massachusetts, at least, the doctrine of Goddart v. Garrett, 2 Vern. 269, is in full force. But, whether the court were in a strict and technical sense right in this view of the matter or not, I still think, that the court did put the law applicable to a case of this sort correctly to the jury. The court said, that if the defendants meant to insure on interest, and the plaintiff meant a gaming policy, it was void; so that the point as to the gaming was put as favorably for the defendants, and as directly to the jury, as it could be.

The next exception is, that the court instructed the jury, on the point of valuation, that the plaintiff was entitled to a verdict, unless there was an over-valuation made by the plaintiff fraudulently, and with a design to deceive the defendants. To understand this exception fully, it is proper to state, that the line of argument of the counsel for the defendants on this point was, that if there was a designed gross over-valuation of the profits by the plaintiff, (whatever might be the moral character of the transaction,) it was in point of law a constructive fraud upon the defendants, which avoided the policy; and that a trivial interest would not save the policy. And the court expressly gave the same opinion to the jury. No point was made or argued, as to any over-valuation by mistake. But after the close of the argument, the counsel for the defendants requested the court to instruct the jury, that if the plaintiff expected a larger shipment of goods than was actually shipped, and made his valuation of profits upon that basis accordingly, then, that he was entitled to recover only pro rata, as the actual shipments bore to the expected shipment. And to this doctrine the court assented; and instructed the jury accordingly.

The charge of the court is now complained of, because it put the case of gross over-valuation, as a question of fraud, solely to the jury. Now, in so doing, it did no more than repeat the very doctrine asserted by the defendants' counsel; and it was no part of its duty to suggest any other points, which in certain postures of the case might possibly have been urged by counsel. But I am yet to learn, that the law is otherwise than it was stated by the court. By the law of Massachusetts valued policies are valid in general; and certainly valued policies on profits fall within the same rule.[11] What then is the effect of the valuation in point of law? It is, that it shall, in all cases of

---

[9] See Lucena v. Craufurd, 2 Bos. & P. (N. R.) 269, 321–323; Cousins v. Nantes, 3 Taunt. 513, 515, 523.

[10] See Lowry v. Bourdieu, Doug. 469, 470.

[11] See Grant v. Parkinson; Marsh. Ins. c. 3, § 8, p. 97; Barclay v. Cousins, 2 East, 544; Henricksen v. Margetson, Id. 549, note; Abbott v. Sebor, 3 Johns. Cas. 39; Phil. Ins. c. 3, § 8, p. 46; Patapsco Ins. Co. v. Coulter, 3 Pet. [28 U. S.] 222, 238.

total losses, where there is a substantial interest, and bona fides, be conclusive in respect to the value. It is true, and it was so stated by the court, that a trivial interest will not save the policy. Neither will a substantial interest, if there is an intent to deceive or mislead the underwriters. And a gross over-valuation affords a presumption of fraud. But if the policy is procured in entire good faith; if there is no intent to deceive; and if there is a substantial interest; then the over-valuation, whatever it may be, is unimportant. The assured is entitled to recover upon general principles of law. And, indeed, under such circumstances, the underwriters are estopped to press the inquiry.[12] And in the very policy before the court, the defendants not only agreed to the valuation, and received the premium for it; but they expressly stipulated, that the policy should be the only proof of interest required. Upon what ground, other than fraud, are they entitled to escape from such a stipulation? If the policy is upon interest, and the valuation fairly made, and they agreed to be bound by it, and they have not been deceived; what right can they have to insist, that they ought not to perform their agreement?

No case has been cited, which affirms a different doctrine; and there are many, which inculcate this doctrine in cogent terms. In Lewis v. Rucker, 2 Burrows, 1171, Lord Mansfield said: "It is settled, that upon valued policies the merchant only need prove some interest to take it out of the statute of 19 Geo. II., because the adverse party has admitted the value; and if more was required, the agreed valuation would signify nothing. But if it should come out in proof, that a man had insured £2,-000, and had an interest on board to the value of a cable only, there never has been, and I believe there never will be a determination, that by such an evasion the act of parliament may be evaded. There are many conveniences from allowing valued policies. But where they are used merely as a cover to a wager, they would be considered as an evasion." Lord Mansfield, in the case of Da Costa v. Firth, 4 Burrows, 1969, in the passage already cited, held the same doctrine. I am not aware, that a different doctrine has been anywhere established.[13] If the over-valuation be bona fide and innocent, the policy is good; if fraudulent, it is void.

Then, as to the other point, in which the defendants' counsel prayed the instruction of the court on the effect of an expected shipment and an actual shipment, complaint is made, that it was not made sufficiently intelligible to the jury. How that matter was, I cannot say. But I am bound to presume, that they understood the point. Certainly, if it had been deemed very material in the actual posture of the case, it might have been commented upon by the counsel for the defendants; and the court would have made any further explanations, which they should have requested. But the truth is, that in the actual state of the evidence there were no facts to raise the point; and so the evidence was stated to the jury at the suggestion of the defendants' counsel. At the time of the insurance, the plaintiff had a perfect knowledge of all the shipments addressed to him by the Leonora; and if so, there was no ground to say, that he then expected none.

The next exception is, that the verdict is against evidence, or at least against the weight of evidence. The argument is, that the evidence in the cause established, that the over-valuation was so gross, that it was necessarily presumptive of fraud; that it could not enter into the reasonable expectations of any man to make such profits on such a voyage; and that the jury have been wholly mistaken in their verdict. In considering questions of this nature, I confess myself among those judges, who are very reluctant to intermeddle with the verdicts of juries in mere matters of fact. There was a time, when courts were disposed to go an extravagant length on this subject, and to set aside the verdict of the jury, merely because, in the opinion of the court, the weight of evidence was on the other side. This was, indeed, substituting the court for the jury in trying the credibility of testimony, and the weight of evidence. For one, I am not disposed to proceed far upon this dangerous ground; and in matters of fact, I hold it to be my duty to abstain from interposing with the verdict of a jury, unless the verdict is clearly against the undoubted general current of the evidence, so that the court can clearly see, that they have acted under some mistake, or from some improper motive, or bias, or feeling.[14] I adopt the language of Lord Ellenborough, in Carstairs v. Stein, 4 Maule & S. 192, 199: "The question before us is not, whether the verdict given in this case is such, as we should ourselves have given; but whether, having been given by a jury, to whom the whole case was fully left in point of fact, and to whom the law upon the subject was distinctly stated, it ought to be set aside, upon the grounds of the argument now suggested to us, namely, that they have drawn an erroneous conclusion." And upon a question of fraud in fact, which is made up of so many ingredients, and is so peculiarly within the province of a jury, I do not hesitate to say, that I should

---

[12] See 2 Kent. Comm. (2d Ed.) Lect. 38, pp. 272, 273, and Id., note (d.)

[13] See Phil. Ins. c. 14, § 1, pp. 305, 306; Marine Ins. Co. v. Hodgson, 6 Cranch, [10 U. S.] 206; Feise v. Aguilar, 3 Taunt. 506; Coolidge v. Gloucester Ins. Co., 15 Mass. 341, 344.

[14] See Thurston v. Martin, [Case No. 14,018;] Blunt v. Little, [Id. 1,578.]

be more reluctant to interfere, than in many other cases.

Now, upon the evidence, it was clear, that there could not be any profit upon bullion; for it was said, that none is ever made or expected. Upon the hides, according to the calculations, variously made by the plaintiff, there might be a profit from $1700 to $2500. On the other hand, by the calculations offered by the defendants, and supported in a good measure by the evidence, there might under some aspects be even a loss, and at all events there could not be a profit exceeding $100 or $200. These calculations were submitted to the jury; and the question was left to them in this way, whether the over-valuation of the profits was designed to mislead the defendants into underwriting a policy not in fact on interest. If they thought it was, then, the policy was void. Their verdict in effect was, that the over-valuation was not fraudulent, but bona fide. And if the court now sets aside their verdict, it must be, because the court now clearly sees, that the jury ought upon the evidence to have found the over-valuation fraudulent. If it was a measuring cast, then, as the onus probandi was on the defendants, the verdict ought not to be disturbed. Now, certainly, I have a good deal of difficulty upon the evidence in seeing, how such an over-valuation could have been reasonably made. But, on the other hand, I have a good deal of difficulty in imputing fraud to the plaintiff. I do not know, that any over-valuation, however great, if it steers wide of a wager and a fraud, can be otherwise impeached. There is something, too, in the nature of an insurance on profits, which distinguishes it from any other insurance, whether on ships, or on goods, or on freight. The latter are generally susceptible of an exact valuation. But profits are not. In their very nature they are contingent and speculative; and upon them men's judgments, as well as their imaginations, run wide from each other. It has been truly said at the argument, that there can be no standard of valuation of profits. They are matters of expectation. A policy on profits is not an insurance upon results, but upon expectations. The party insures, not what profits he would actually make, but what he expected to make. It is difficult to measure men's expectations. There are complexional differences of mind on such subjects. There are vast distances between the moderated views of the timid and cautious, and the high-colored views of the sanguine and enterprising.

It is not sufficient to justify the court in setting aside the present verdict upon this ground, that it should doubt whether the over-valuation was innocent. It must clearly see, that it was fraudulent. Suppose the verdict should be set aside, and upon a new trial the jury were to find for the defendants, would that be entirely satisfactory? Might not the plaintiff fairly contend, that

it was only verdict against verdict on a question of fact; and, therefore, that there should be a third trial to settle the controversy? I am not insensible of the force of the defendants' argument on this point. But after all, it turns upon this, that the court must find the fraud, which the jury refused to find. In Coolidge v. Gloucester Ins. Co., 15 Mass. 341, 344, the freight was valued at three times its real value; and yet the court refused to open the policy. In the case of Patapsco Ins. Co. v. Coulter, 3 Pet. [28 U. S.] 222, which was upon a policy on profits, valued at $20,000, the supreme court held, that it was not necessary to show, that any profits would have been made. Now, this must have proceeded upon the ground, that, if the valuation was bona fide, however great, it was of no consequence, whether it could or could not be shown, that profits would have resulted from the voyage. The court asked, what human calculation or human imagination could have furnished testimony on a fact so speculative and fortuitous? Upon the whole, upon this point, whatever might be the scruples of my own mind upon the evidence, if I were sitting in the jury-box, I cannot say, that it clearly appears to me, that the jury were wrong in finding, that the over-valuation was not fraudulent. I am not bold enough to disregard their judgment in a case fairly before them, upon a matter of fact purely and fitly within their province.

I come, then, in the last place, to the new evidence, discovered since the trial; and that is, that a prior policy was underwritten at New York on profits valued at $10,000, on the same voyage and risk, which has been paid. This is perfectly consistent with the plaintiff's case, and furnishes no new matter of defence; since in the present policy the profits are valued at $20,000; so that the amount is sufficient to cover both policies. It is, therefore, at most, the case of newly discovered evidence to an old point of defence. Now, the objections taken to it, as a ground for a new trial, are, in the first place, that the defendants at the trial made the point, that there was in all probability another policy on profits, and yet that they used no diligence, though they were thus put upon inquiry, to ascertain the fact. And what is still more strong, that having a clear right in this court upon motion to have compelled the plaintiff in this very cause to disclose the fact, whether there was any prior policy or not, they chose to go to trial without making the inquiry, though it is plain, that ordinary diligence would have brought it out. There is great force in this reasoning; and no answer was given to it at the argument, which entirely satisfied my mind. To set aside a verdict under such circumstances, on account of such newly discovered evidence, would be to encourage laches, and want of diligence, in regard to matters manifestly

open to inquiry, under the common priority clause in our policies. It would enable the party to take a double chance for a verdict. But what is the nature of the new evidence? It is said, that it is not merely cumulative, because it shows that the plaintiff had already received $10,000 profits on the same voyage. But what has that to do with his title to recover $10,000 more, if the profits are bona fide valued in the second policy at $20,000? It is, therefore, merely as it bears upon the point of over-valuation, that it has any relevancy to the cause. And I cannot say, that I see much in it, in a legal sense, even under this aspect; for, the valuation being $20,000, the argument as to the over-valuation is precisely the same in form and pressure, in point of law, (whatever it may be as matter of remark to a jury,) whether the plaintiff stood underwriter for the remaining $10,000 or procured it to be insured. In either view, the valuation must stand or fall, as a valuation for $20,000 and not for $10,000. If, indeed, there had been expected shipments not actually put on board, and so an apportionment might have been required, then it might have become more material. But this, as I have already said, was excluded by the state of the facts. I can contemplate this evidence, then, in no other light, than as cumulative evidence. Now, it has been long established, as a just and reasonable practice, not to grant a new trial to introduce new witnesses, or new evidence, to points before in controversy. And there would be no safety in trials upon any other doctrine. Steinbach v. Columbian Ins. Co., 2 Caines, 129; Smith v. Brush, 8 Johns. 84, and Williams v. Baldwin, 18 Johns. 489, are directly in point. The cases of Gardner v. Mitchell, 6 Pick. 114; Inhabitants of Yarmouth v. Inhabitants of Dennis, Id. 116, note; Chatfield v. Lathrop, Id. 417, and Baker v. Briggs, 8 Pick. 122, adopt the same principle.[15] And it seems also to prevail in England.[16]

I have thus gone over all the grounds urged with so much earnestness and ability in favor of a new trial. The conclusion, to which my mind has arrived, is, that the jury have not been misdirected in any matter of law; and that as to the matter of fact, it was fairly open before them, and peculiarly within their province; and I cannot judicially say, that the conclusion, to which they have come, is clearly erroneous, and must have arisen from some unquestionable mistake, or some improper motive or bias. In my judgment, therefore, the motion for a new trial ought to be overruled.

New trial denied.

---

[15] See, also, cases in Bigelow, Dig. Review & New Trial, C. k., p. 681; Astor v. Union Ins. Co., 7 Cow. 202; Ackley v. Kellogg, 8 Cow. 223; Douglass v. Tousey, 2 Wend. 352; Smith v. Hicks, 5 Wend. 48.

[16] See Dickenson v. Blake, 7 Brown, Parl. Cas. 177; Carstairs v. Stein, 4 Maule & S. 192, 199; Sprague v. Mitchell, 2 Chit. 271.