### THE LIVINGSTONE et al.

(District Court, W. D. New York. April 10, 1903.)

**1. MARINE INSURANCE—VALUED POLICY—EFFECT OF ABANDONMENT AND PAYMENT OF TOTAL LOSS.**

The value of a ship as fixed by a valued marine policy is conclusive on the parties to the contract. Where there is a total loss through collision, and she is abandoned by the owner to the insurer, the latter cannot impeach the valuation stated in the policy; and on the other hand, on payment of such value, the insurer becomes the owner of any salvage that may afterward be realized, and of the entire amount which may be recovered by suit against another vessel held in fault for the collision, although it may exceed the amount paid under the policy.

**2. SAME—RIGHTS OF INSURER—RECOVERY FOR COLLISION IN EXCESS OF INSURANCE PAID.**

Petitioners were insurers of a steamer owned by libelant under valued policies. The steamer was sunk in collision, and was abandoned by libelant to petitioners, who accepted the abandonment and paid her stipulated value. Subsequently, libelant brought a suit against the other vessel in the collision, in which cargo owners joined, and a decree was entered on account of the loss of the vessel in a sum considerably exceeding her insured value. Petitioners refused to come into such suit, being also insurers of the libeled vessel, but sought to prevent recovery therein, and notified libelant of their claim that it had no interest therein except for the protection of cargo owners. After the money in satisfaction of the decree had been paid into the registry of the court, they filed their petition under admiralty rule 43, claiming all of the fund awarded as damages for loss of the vessel. *Held,* that under the circumstances they were not chargeable with such laches, in failing to intervene under rule 34 and set up their contention, as precluded them from asserting their legal right to the fund, or as gave libelant any equitable right to more than reimbursement for its reasonable counsel fee and expenses.

In Admiralty.

See 113 Fed. 879.

Butler, Notman, Joline & Mynderse (Wilhelmus Mynderse, of counsel), for petitioners.

John G. Milburn and Harvey D. Goulder, for libelants.

HAZEL, District Judge. This is a motion by certain petitioners directing the final disposition of a fund in the registry of the court as between the owners and the underwriters of the injured ship.

On October 19, 1896, the steamer Grand Traverse, owned by the libelant Lackawanna Transportation Company, collided in Lake Erie with the steamer Livingstone. Both vessels were under way. The Grand Traverse sunk in the channel about three miles east of Colchester Light, and became a total loss. Her owner libeled the Livingstone, attributing to that vessel the whole fault of the disaster. Claimants of the cargo of the Grand Traverse, and others sustaining

¶ 1. See Insurance, vol. 28, Cent. Dig. §§ 1222, 1224, 1240, 1514.

loss through collision, either joined in the original libel or have inter-
vened. The petitioners are underwriters of the Grand Traverse, and
claim the fund paid by the Livingstone into the registry of the court
for distribution, pursuant to the final judgment holding that vessel
solely in fault. They did not intervene, as they could under admiralty
rule 34, at an earlier stage of the proceeding, but now come before
the court after final judgment under admiralty rule 43. Both steam-
ers were found in fault by the District Court. 104 Fed. 918. The
decree of the District Court was reversed by the Circuit Court of
Appeals as to the alleged fault of the Grand Traverse, and the Liv-
ingstone was held solely in fault, as already stated. 51 C. C. A. 560,
113 Fed. 880. Accordingly, a decree against that vessel and her
stipulator was entered for $59,311.70, with interest and costs. This
sum, less $25,000 credited by stipulation upon the decree, was paid
into the registry of the court. Subsequently, by agreement of the
parties in interest, the sum of $15,586.91 was distributed, leaving a
balance on deposit of $18,354.38. Of this sum the petitioners are ad-
mittedly entitled to the accumulated interest on the sum of $25,000,
which they had previously paid to the libelant owner of the Grand
Traverse, in accordance with the terms of certain marine policies of
insurance. The surplus, amounting to $12,500 and accumulations of
interest, is in dispute. The entire balance is claimed by the under-
writers, the libelants having abandoned the Traverse to them soon
after she sank as a result of the collision. The facts are these: At
the time of the loss, the Grand Traverse was insured in various sums
amounting to $25,000, made up of valued policies of marine insurance
issued by different English companies, the total value of the vessel
being placed at $25,000 in each policy. On the day following the col-
lision, the libelant, in accordance with the terms of the policies, aban-
doned the wrecked vessel to the underwriters by a formal notice.
Such abandonment was later on the same day withdrawn. Subse-
quently, however, and on December 31, 1896, she was again formally
abandoned, the notice to the insurers containing the following words:
"The company has decided to abandon the ship, and hereby give notice
of such abandonment, as provided in the policies issued from your office on
said steamer Grand Traverse."

The underwriters formally acknowledged this abandonment on Jan-
uary 5, 1897, in the following communication:
"We have your favor of the 31st ult. making abandonment of steamer
Grand Traverse, which we hereby accept on behalf of underwriters. If you
will send us proofs of loss and policies, we will at once proceed with settle-
ment of total loss."

On January 7, 1897, the policies and proofs of loss were duly filed
with the agent of the underwriters. Subsequently, on January 23,
1897, a bill of sale of the Grand Traverse was executed and delivered
to the assurers. It is admitted that the assurers paid the sum of
$25,000 for and on account of the total loss of the ship, and that they
sold the abandoned wreck for $300, which sum was expended for sur-
veys and otherwise, and that later the vessel was blown up to clear
the channel. The final recovery against the Livingstone in favor of
the owners of the Grand Traverse, amounting to $37,500, was for the

full value of the ship as an actual total loss. The proofs show that the libel against the Livingstone was conducted exclusively by the owners of the Grand Traverse and her cargo. The petitioners were also insurers of the vessel held solely in fault. They declined to proceed against the Livingstone, or to intervene in the pending litigation or contribute thereto. It is practically admitted that they defended the wrongdoing vessel, and were liable under their policies of insurance on the Livingstone to pay whatever amount might be decreed against her. The owner of the Grand Traverse contests the petition, and asserts that it is entitled to the whole amount adjudged to have been the complete loss, though it has already been paid the full value for which the Grand Traverse was insured and at which it was valued in the various policies of insurance. Upon this statement of facts, the questions which are submitted for decision are whether, by the abandonment of the Grand Traverse, the underwriters on these valued policies stand in the place of the insured vessel, and whether the abandonment, when accepted by the underwriters, operates as an absolute conveyance of the title of the ship, carrying with it the spes recuperandi as to the whole damages against the tort feasor.

It is contended, for the libelant, that the abandonment did not ipso facto pass to the assurers a right of action against the ship whose tortious act produced the total actual loss, beyond the amount of insurance paid in fulfillment of their contract, and that the choses in action against the Livingstone could not pass to the insurer, as the abandonment transferred only the physical property which was subject to the contract of insurance. It is vigorously insisted that the assurers' remedy against the wrongdoer arises from the equitable doctrine of subrogation, and therefore the remedy open to the petitioners is only in the nature of indemnity and for reimbursement of the amount paid by them. These contentions cannot be maintained. It is a well-settled principle of law that, where the loss covered by marine insurance is absolute, the assured is entitled to recover the amount for which he was insured, without giving notice of abandonment. It is practically conceded on all sides that the Grand Traverse was a total loss, and that by the abandonment very remote opportunity was afforded the insurers to diminish the loss by salvage. Preliminary notice of abandonment, as held by the cases, is essential only where the insured elects to convert a constructive or technical loss into an absolute total loss. Fleming v. Smith, 1 H. L. Cas. 513; Hall & Long v. Railroad Cos., 80 U. S. 371, 20 L. Ed. 594. Under such circumstances it is implied that the property insured and partially destroyed is in danger of total loss by the perils insured against, and, further, that some hope or chance remains of rendering absolute destruction doubtful or problematical. The rights of the parties become fixed and determined by the abandonment. Peele v. Merchants' Ins. Co., 3 Mason, 27, Fed. Cas. No. 10,905; Knight v. Faith, 15 Q. B. 647; Arnould on Marine Ins. § 1091; Bradlie v. Maryland Ins. Co., 12 Pet. 378, 9 L. Ed. 1123; 3 Kent's Com. 321; Orient Ins. Co. v. Adams, 123 U. S. 67, 8 Sup. Ct. 68, 31 L. Ed. 63. A recent well-considered English decision, Sailing Ship "Blairmore" Co. v. Macredie [1898] App. Cas. 593, holds that a total loss is incurred when a ship

goes to the bottom, irrespective of what may afterwards be done by the underwriters. As the Grand Traverse was an absolute total loss, without a remaining chance to the underwriters of dealing profitably with her or in any manner diminishing their loss, preliminary notice of abandonment would appear to have been unnecessary. The rule is stated in Arnould on Marine Insurance as follows:

"Section 1045. If by reason of those perils the assured is permanently and irretrievably deprived, not only of all present possession and control over it, but of all reasonable hope or possibility of ever ultimately recovering possession of or further prosecuting the adventure upon it, that is a cause of absolute total loss, independently of the election of the assured to treat it as such. Notice of abandonment would in such case be a mere idle formality, because nothing remains to be abandoned. In such cases, therefore, no notice of abandonment is required; but if any remains of the wrecked ship or perished goods ultimately come to hand * * * are considered as a salvage to which underwriters are entitled after payment of total loss. Hence it is that absolute total losses are familiarly known in insurance law as 'salvage losses,' without abandonment."

Nevertheless, whatever the status of the injured ship, she was actually abandoned by her owners, and the assurers accepted such abandonment. They paid the amount agreed upon in the policy of insurance as the value of the ship. As acts of abandonment must be judged from the circumstances of each case, the criterion established by the parties themselves is the test of abandonment, and from that standard the questions involved will be considered. What interest in the abandoned ship was acquired by the underwriters? To what extent is such interest affected by payment of the value of the ship as fixed by the policies on account of which the loss is paid? The contract of insurance under consideration by its terms contemplates the payment by the assurers on the basis of the full value of the ship, as fixed in the policy, whenever a loss insured against shall have been sustained. It was the intendment of the assured and assurers that the subject of the insurance should have a stated, fixed, and determined value. The adjustment and determination of all loss and damages sustained were dependent upon the value stated in the contract of insurance. What the parties intended is therefore defined and controlled by the policy. It is not claimed that any of those conditions upon which a settlement of the loss is based is either fraudulent, inconsistent, or repugnant to the legal rights of the assured, and hence such valuation is conclusive upon the parties as the sum which the assured is entitled to receive at the hands of the assurers. This is the principle enunciated in Marine Co. v. Hodgson, 6 Cranch, 206, 3 L. Ed. 200; Barker v. Janson, L. R. 3 C. P. 303. The Providence & Stonington Co. v. The Phoenix Ins. Co., 89 N. Y. 560, and other well-considered cases. In Marine Ins. Co. v. Hodgson the court expressly decided that in an action upon a valued policy it is not competent to give parol evidence that the ship was of different value from that stated in the policy. In Columbian Ins. Co. v. Ashby, 29 U. S. 143, 7 L. Ed. 809, the Supreme Court held that the insured, by operation of law, became, after abandonment, the agent of the underwriters, and he was obliged to lighten the burden which was to fall on the underwriters by endeavoring to save from destruction such of the property insured as he could.

In the case of Chesapeake Insurance Co. v. Stark, 6 Cranch, 268, 3 L. Ed. 220, the general rule was laid down that, if the abandonment be legally made, the underwriter completely takes the place of the assured, and the agent of the assured becomes the agent of the underwriter. Had the Grand Traverse been overvalued, such valuation could be impeached only because of fraud, wager, or enormous overvaluation. This principle of law has been many times approved. Alsop v. Commercial Ins. Co., 1 Sumn. 451, Fed. Cas. No. 262; Barker v. Janson, supra. Volume 19, Ency. of Law, 1049; Voisin v. Ins. Co., 51 App. Div. 561, 65 N. Y. Supp. 333. Upon what principle would this court be justified in setting aside the agreement of the parties as to the value of the ship in case of an undervaluation, or where, as here, the vessel was worth more than the sum stated in the valuation named in the policy? Manifestly, the converse of the enunciated doctrine which declares that, when the ship has been overvalued, the insurance company can escape liability only for mistake or mala fides, must also apply by analogy upon an undervaluation to the advantage of the insurer. The gist of the application of the rule is based upon the effect which must be given to the express intention of the parties, who are necessarily presumed to know the consequences of their acts. Hence the conditions of the policies under consideration are of prime importance. It will not suffice to say that the assured failed in completely understanding the terms of the contractual relations, or that he was ignorant of the law applicable to the valued policy. Acceptance of the policies by the assured not only implies full knowledge of their contents, but assumes that they were taken subject to the terms and conditions therein expressed. The law assumes that in every valued policy the entire subject-matter has been made the basis of the valuation. 1 Arnould, §§ 345, 346. It is therefore clear that more than a mere claim for indemnity, based upon the principle of subrogation, passed to the petitioners. They became entitled not only to the remains of the ship, but to the right to recover damages against the tort feasor as an incident to the payment of the agreed valuation of the ship. The rigid rule which applies to the case at bar is founded upon the doctrine announced in The North of England Iron SS. Ins. Ass'n v. Armstrong, L. R. 5 Q. B. 244, by Chief Justice Cockburn, where the reasons for the rule are thus set forth:

"Where the policy is an open policy, and simply a policy of indemnity as to the actual value of the vessel, no difficulty would arise in such a case as this. It is only because it is a valued policy that these difficulties present themselves. I think we must still apply the old rules, and not make new; and if a party chooses to have his vessel or his goods, as the case may be, taken at a fixed value, instead of leaving the contract, as in an ordinary policy, simply one of indemnity to the extent of the real value, and if thereby any benefit accrues to the underwriters, the underwriters must be entitled to it."

In the same case Lush, J., stated as follows:

"If each of the parties agrees that a certain sum shall be deemed to be the value of the thing insured, the underwriter, in case of a total loss, is not to be at liberty to say the thing is not worth so much; he is bound to pay the amount fixed upon, whether it is a proper amount or not. And, on the

other hand, the assured is not at liberty to say it is worth more; he is bound by that amount. * * * If the underwriters had got the wreck up, and if they had procured the wrongdoer to repair the vessel, the vessel so repaired would still belong to the underwriters. What difference can it make whether the wrongdoer repairs the thing in specie, or pays in money the amount it would take to repair? In either case, whatever is recovered belongs to the underwriters, by reason of their having paid that which both parties agreed should be deemed to be the full value of the property insured."

The essence of this rule is also based upon the contractual relations between insurer and insured fixing and determining the full value of the ship. I can see nothing unconscionable in the requirements of the law, where, as here, the vessel was abandoned with full knowledge of the legal rights and remedies which, by virtue of the transfer and claim for a total loss, vested in the underwriters. The English doctrine has been approved and followed by the courts of this country. Indeed, prior to the decision in the Armstrong Case, Justice Story, in Comegys v. Vasse, 1 Pet. 193, 7 L. Ed. 108, in speaking of the rights and remedies of the assured, said:

"The law gives to the act of abandonment, when accepted, all the effects which the most accurately drawn assignment would accomplish. By the act of abandonment, the assured renounces and yields up to the underwriters all his right, title, and claim to what may be saved; and leaves it to him to make the most of it, for his own benefit. The underwriter then stands in the place of the assured, and becomes legally entitled to all that can be rescued from destruction."

Further on in the opinion he says:

"Whatever may be afterwards recovered or received, whether in the course of judicial proceedings or otherwise, as a compensation for the loss, belongs to the underwriters."

See, also, Clark v. Wilson, 103 Mass. 219, 4 Am. Rep. 532; The Potomac, 105 U. S. 630, 26 L. Ed. 1194; Mobile, etc., Ry. Co. v. Jurey, 111 U. S. 594, 4 Sup. Ct. 566, 28 L. Ed 527; Phœnix Ins. Co. v. Erie Trans. Co., 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873; The St. Johns (D. C.) 101 Fed. 469; Mason v. Marine Ins. Co., 49 C. C. A. 106, 110 Fed. 452, 54 L. R. A. 700. In Mobile, etc., Ry. Co. v. Jurey, supra, the Supreme Court repeated the rule as follows:

"Insurers of a ship which has been run down and sunk by the fault of another ship are, upon their payment of a total loss, subrogated to the right of the insured to recover therefor against the owners of the latter vessel, and, if their policy was a valued one, their payment of this value will give them the whole spes recuperandi, and the right to the whole damages, though the insured vessel was in fact worth a larger sum than the valuation named in the policy."

In Phœnix Ins. Co. v. Erie Trans. Co., 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873, the Supreme Court, having a similar question before it, said:

"From the very nature of the contract of insurance as a contract of indemnity, the insurer, when he has paid to the assured the amount of the indemnity agreed on between them, is entitled, by way of salvage, to the benefit of anything that may be received, either from the remnants of the goods, or from damages paid by third persons for the same loss."

This was a case arising upon payment of a total loss upon the goods insured. It is evident that the entire current of authority is to the

effect that the right of the assurer to recover damages against a wrongdoer springs from the policies of insurance, and upon the acquirement of the thing insured, because of payment of full value, passes to the insurers whatever rights of action the insured has. Under an ordinary policy the right of the underwriters who have paid a total loss to recover against third parties who caused the damage is limited, upon equitable principles of subrogation, to the amount paid; while under a valued policy, as in the case at bar, the agreed value of the vessel having been paid, all rights of action, irrespective of the amount which may be recovered, vest absolutely in the insurers. The Monticello, 17 How. 152, 15 L. Ed. 68, and cases cited.

Notwithstanding these decisions, a different rule is contended for by counsel for libelant. I am unable to perceive from the record how this court, upon any theory, can hold that the subrogated rights of the insurers simply arise by subrogation, and should not exceed the valuation paid. It may well be that the insurance companies ought not to receive more than they actually paid. Perhaps no profit ought to be earned by them through the fate of the Grand Traverse, but, as has been observed, insurers are liable on valued policies for overvaluation of the thing insured. It would be, therefore, a peculiar rule which construed the plainly understood terms of a policy, formulated by the parties themselves, in a manner depriving the assurer of accrued benefits, simply because of the remarkably rare feature of a recovery in excess of the amount paid by the underwriters to the assured. Suppose the value of the Grand Traverse had been adjudged less than the value agreed upon, could it be successfully contended that the insurance companies were entitled to a return of the amount paid over and above the stipulated value? Clearly not. This question was again answered in the negative, by implication at least, in the St. Johns Case. The mere failure to find a case in the books where an insurance company, the ship having been abandoned, recovered damage against the tort feasor over and above the insurance paid on a valued policy, will not justify a departure from the principles laid down by the text-writers of marine insurance, and the many analogous decisions by the highest courts of England and this country. The rule found in the Armstrong Case, which has guided those who have taken and accepted insurable marine risks for many years, has been reaffirmed by our courts beyond all uncertainty and dispute. I do not regard myself at liberty to depart from an established principle which, to use the language of Judge Brown in International Navigation Company v. Atlantic Mutual Insurance Co. (D. C.) 100 Fed. 314, is "so long established as may well be deemed to enter into the contract as the understanding of the parties to it."

The equities of the case. The insurance companies might have originally libeled the Livingstone to recover the damages to which they became entitled by the abandonment and payment of the agreed value of the sunken ship, or have permitted the owners of the Grand Traverse to prosecute the Livingstone in their behalf. The Keokuk, Fed. Cas. No 7,721. Instead of availing themselves of their legal rights to intervene, the libel having been instituted by the owners of the Grand Traverse, they attempted to prevent successful termination

of the suit; but their antagonism to the litigation, and the reason therefor, was seasonably brought to libelants' attention. By the letter of their agent, dated January 28, 1897, very soon after the libel was filed, the owner of the Grand Traverse was notified that by the terms of the abandonment and of the bill of sale its interest in the pending litigation ended, except to protect the interest of cargo owners. Despite such notice, libelant continued a troublesome and expensive suit and succeeded in establishing sole blame for the collision upon the Livingstone. The fund out of which cargo owners were paid, undoubtedly was created by the acumen of libelant. Does the energy displayed entitle libelant to the balance of the fund? From the view herein expressed, manifestly, forfeiture on the part of the underwriters could only be charged for gross laches on their part. The prosecution of this cause by the owner of the Grand Traverse at large expense and annoyance, without action by the underwriters, when it was within the interveners' power to bring the involved questions earlier to the attention of the court, is not free from criticism. The peculiar position of the underwriters as to both vessels must be regarded as some justification for their position, although it cannot be considered as a waiver of its claim to the surplus fund. The litigation was won, not only without petitioners' aid, but against their positive wishes. Even under such circumstances it may well be doubted whether the underwriters can be held liable for such laches as will preclude them from having refunded to them the balance on deposit with the register of the court over and above costs, expenses, and an allowance for the legal services performed in prosecuting the libel to a final determination. Mason v. Marine Ins. Co 49 C. C. A. 106, 110 Fed. 452, 54 L. R. A. 700. By seasonably intervening under admiralty rule 34, they probably could have ended the litigation. It is difficult to perceive why they did not do it. Whether they anticipated a possible advantage by a decree holding both steamers in fault is neither apparent nor pertinent. The proceeds of recovery still in the registry, in accordance with the foregoing views, belong to the interveners. The libelant claims that on equitable principles it is entitled to reward for creating the fund, in the absence of efforts to that end by the petitioners. The most which can be awarded them, it having been decided that the proceeds of the suit belong to another, would be their reasonable counsel fees and expenses. No portion of the recovery can be set off to them as a reward of merit. By stipulation, the counsel fees and expenses, duly itemized, have been paid out of the fund. The amount was agreed upon by the parties, and that amount will be taken as the measure of expenses incurred in creating the fund, and will therefore be allowed to libelant. The fund in court having been already depleted to that extent, the entire balance, less court fees, must be paid to the petitioners. A decree may be entered accordingly.