CHASE and others *vs.* THE WASHINGTON MUTUAL INSURANCE COMPANY OF CINCINNATI.

Common carriers, being liable for goods which they have undertaken to carry, have a beneficial and an insurable interest therein.

That interest will continue, notwithstanding the goods insured are transported by the carriers in vessels belonging to other persons, chartered by them for that purpose. In such a case the charterers of the vessel, and not the owners, are the proper persons to insure the cargo, as common carriers.

An omission, in an application for insurance upon a cargo, to state who are the owners of the vessel, will not vitiate the policy; where such omission does not affect the risk, nor the rate of premium.

A policy of insurance which states that the underwriters insure " S. G. C. & Co. on account of the Western Transportation Company," on merchandise by certain specified boats, although it may justify the inference that the assured are insured as common carriers, will not imply that they are the *owners* of the boats named.

Where a policy of insurance, after having been executed and sent to an agent of the underwriters to be delivered to the assured, was sent back to the general agent of the insurers, for *correction,* who destroyed the same—so far at least as to make its legal vitality doubtful—by tearing off the seals and names of the president and secretary of the insurance company, and when requested, after a loss had occurred, refused to return the policy; *Held,* that this act of the agent authorized the insured to come into a court of equity for relief against the insurers.

THIS was an appeal from a decree entered in favor of the plaintiffs, at special term, on the report of a referee.

Wm. James Boggs was the general agent of the defendants

for New-York and vicinity, with full power from them to effect insurances binding on them, and to deliver policies. He employed C. W. Bentley, an insurance agent at Albany, to act as the agent of the company at that place, and gave him written instructions indicating his powers. The plaintiffs were common carriers by the canal, between Albany and Buffalo, by the name of the Western Transportation Company. They needed the use of more boats than they owned, and agreed with Teall & Co., on the 24th of April, 1847, to ship three boat loads of goods in boats of Teall & Co., between that time and the 3d of May then next, inclusive. This last firm was called the Erie Canal Company. Under this contract three boats belonging to the Erie Canal Company were loaded by the plaintiffs; viz. the Wm. Gilmer, the Credit and the Tim. Teall & Co., in pursuance of an arrangement with the plaintiffs that they should effect insurance for the plaintiffs, or for their benefit, upon the cargo so shipped, arranged with Bentley to insure the cargo. Taking (as is most favorable to the defendants,) Mr. Boggs' representation of the facts, they were as follows : Bentley called on Boggs about the 5th of May, 1847, and said that he had an application for the plaintiffs for the boats Wm. Gilmer, Credit and Tim, and five other boats, for $2000 each, up trips, meaning $2000 on the cargo of each boat going from Albany to Buffalo; that the Credit was then loading at Albany; and he wanted to know if Boggs would take the risks. Boggs inquired if the boats were good, and was answered in the affirmative. He then said that he would take the risks. He was asked to make out a policy for the *Credit*, as the line was not completed. When they were, Bentley was to give a list of the names of the other boats to be insured. Boggs testified, " As I told Bentley I would take the risk on the Credit, he wanted the policy. I told him I had no inland policies on hand, but expected some in a few days, from the defendants' office in Cincinnati. He then asked me if I had the power to make risks binding. I told him I had. He asked me if I would make the risk on the cargo of the boat Credit binding from that day, in the name of S. G. Chase & Co. I told him I would, and did, and I made the application binding by entering

it on the application book." He further testified that nothing was said as to making the policy in the name of Teall & Co. for the benefit of Chase & Co. That "Bentley requested that the Credit should be made binding, but that none of the other boats should be. He asked me if the Credit was binding for S. G. Chase & Co., and I told him it was, and that I would make out and send the policy as soon as they came to hand." Boggs afterwards received inland policies, and made one out for the plaintiffs, and another for Teall & Co. He testified that he "made them out exactly according to Bentley's request," and that they were in conformity with the agreement for the insurance. The policy thus made out for the plaintiffs commences thus: "The Washington Mutual Insurance Company of Cincinnati: Cargo—By this policy do cause to be insured, lost or not lost, *S. G. Chase & Co.* on account of Western Transportation Company, loss, if any, payable to S. G. Chase & Co. on merchandise for boats Wm. Gilmer, Credit, Tim, Champion, Teetotal, S. P. Williams, and Monticello, from Albany to Buffalo, or to any point on the western canals or lakes within the state of New-York, to wit, $2000 on up trips of each boat from the date of this policy to the first day of December next, inclusive, or to the close of navigation, if prior to that date." Sum insured $14,000, premium $140.

The Credit proceeded with her cargo on her route, and was struck by another vessel and sunk, and her cargo injured to an amount exceeding $3000. Boggs was notified of the loss, and sent agents to take care of the property. He afterwards received the policies from the defendants and forwarded one for the plaintiffs, commencing in the form above stated, to Bentley, and another for Teall & Co. Bentley suggested to the plaintiffs that the policy should have been in the name of Teall & Co. for the benefit of Chase & Co.; and with their approbation altered the policy *in lead pencil*, so that the Gilmer, Credit and Tim should be in one policy insured to Teall & Co., and the amount insured, and the premium, be charged accordingly, and another policy be given to the plaintiffs for the Champion, Teetotal, Williams and Monticello, owned by them, and a third one

to Teall & Co. on other vessels owned by them. Bentley then sent down the policies, with these alterations, to Boggs, who tore off the seals and names of the president and secretary of the company, and afterwards, when requested to deliver the policies, refused to do so. The plaintiffs, not being able to procure the policies to sue on, at law, after waiting until the time for the company to pay the loss had matured, filed their bill, to compel the defendants to deliver a policy pursuant to the agreement, or to pay the amount insured. The cause being referred to a referee, he dismissed the bill, as to Boggs, (who was made a defendant,) but without costs, and on the 28th of February, 1850, he reported in favor of the plaintiffs, against the company, for $2346,08. From the judgment entered on that report the insurance company appealed.

*H. S. Mackay* and *J. V. Loomis*, for the appellants.

*A. Hilton* and *A. Mann, Jun.* for the respondents.

*By the Court*, MITCHELL, J. As Boggs does not appeal, the company can not object that he should have had costs on the dismissal of the bill as against him. The plaintiffs now admit that Boggs was a competent witness, and that Bentley was not the general agent of the company, but was only authorized by Boggs to receive applications. This brings us to the point of defense set up by Boggs, and urged upon the argument. Chase & Co. were common carriers, and as such liable for the goods which they had contracted to carry, unless they were destroyed by the act of God, or the enemy of the country. They had therefore a beneficial and an insurable interest. The goods on board the Credit, in which they had this interest, sustained a loss which the plaintiffs were bound to pay to the owners of the goods, to an amount exceeding the sum insured against, and by an accident within those covered by the policy. The defendants admit that if the insurance had been in the name of Teall & Co. for the benefit of Chase & Co., they would be liable; but they say that by the representation made to them by Bentley, and

by the policy sent by them to Bentley, they were only to insure Chase & Co. as common carriers and *proprietors of the Credit ;* that both represented or warranted that Chase & Co. were proprietors of that boat. And Boggs says that Bentley handed him an application in writing, which he has lost, but of which he furnishes a copy ; and which he considers as proving such a representation. It is as follows :

> " Scow boat Wm. Gilmer, ⎫ May 1,
>     "    "   Credit, ⎬
> Line boat Tim, ⎭ $2000 up.
>           Season, Canals and Lakes.
>                     S. G. CHASE & Co."

And he states that nothing was said as to Teall & Co. This memorandum, it is very evident, does not contain any thing like a statement of all that was to be done, or of all that was said or understood. On its face it appears as if it were the boats that were to be insured, and not the cargo ; and it might be produced to establish such a representation, more effectually than the one alledged. It does not state the premium to be charged, and only by implication when the policy was to commence ; and that erroneously, for it was to be from the 5th of May and is dated 1st of May. There was no false representation in it. There was an omission to state who the owners of the boat were. That could not affect the risk, nor the rate of premium ; especially as Boggs, the agent of the insurers, was informed that the boat was good, and that was true in fact. He inquired as to the only material fact for him to know—whether the boat was good—and was answered in the affirmative : but he made no inquiry who the owner was ; for that could not affect the risk.

It is said Teall & Co. were the only persons who could insure the cargo of the Credit as common carriers. But this can not be so. Chase & Co. were the common carriers, and as such placed the goods on board the Credit. They could not get rid of their liability which they had incurred to the owners of the goods when they undertook to carry the goods, by engaging with Teall & Co. to furnish boats for the carriage of the same.

And as their liability to the owners continued, notwithstanding their contract with Teall & Co., so their interest in the goods continued, and gave them a right to insure, so as to protect themselves against that liability.

It is also said that the plaintiffs could not recover on the policy, because it was an insurance to them as common carriers of the Credit, or as this was explained on the argument, that the policy implied that they were common carriers, and as such owned that boat. Nothing is produced to show this implication, but the commencement of the policy. That does not state, nor is it usual (if it ever is done) to state who are the owners of the vessels by which cargo insured is to be carried. It simply states that the company insure Chase & Co. on account of the Western Transportation Company (loss payable to Chase & Co.) on merchandise by the boats Wm. Gilmer, Credit, &c. It may be fairly implied, as Chase & Co. are insured on account of, or as, the Western Transportation Company, that they are insured as common carriers; as that would be the business of a transportation company. But as common carriers may carry either in vessels of their own or of others and still be liable as such carriers, to the owners of the goods, when the name of the vessel is given it is left uncertain whether it belongs to the insured or others. If they could not carry, except in their own vessels, the inference might be just that the vessel was theirs. But as there is no such restriction on their rights, no such inference can be fairly drawn.

As to the tender, Boggs refused to receive any thing, and one of the plaintiffs made a tender in bank bills, and told Boggs that if any thing more was to be paid he was ready to pay it. Besides, there is no clause, as in ordinary fire policies, preventing the policy taking effect until the premium be paid.

It may be that the agreement of the company would have been fully performed, by sending the policy to Bentley for the plaintiffs, if it had remained with him. But it was sent back to Mr. Boggs for *correction* only; and if he did not choose to correct it accordingly, the plaintiffs had a right to have it back again. This was refused to them, by Boggs, and gives

them a right to come into a court of equity for relief. Though it is not mislaid or lost, or destroyed by time or accident, it was destroyed by the wrongful act of the defendants, through their agent; so far at least as to make its legal vitality doubtful, when it is considered that it was never actually delivered to the plaintiffs.

The obliteration and defacement of the policy, as Boggs calls it, was only *in lead pencil* as Bentley says, and Boggs does not otherwise state it. This was not an alteration, nor a rejection of the policy, but being done with a material that could be easily removed, and which is used that it may be removed, if desired, it amounted to no more than a suggestion of the wishes of the plaintiffs.

As the defendants' own witness establishes all the facts on which reliance is now placed, the objection can not be raised that the proof is doubtful, contradictory or uncertain. The only point on which there is any contradiction, of seeming importance, between the witnesses, is whether the policy was to be direct to Chase & Co. or to Teall & Co. for their benefit. That seems to have been the foundation of this defense, but to have no force in law. It was immaterial which way it was.

The referee's report is correct, and the judgment on it must be affirmed with costs.

[NEW-YORK GENERAL TERM, February 2, 1852. *Edmonds, Edwards* and *Mitchell*, Justices.]