By the Court. Slosson, J.
I shall consider the case principally in its connection with the endorsers, and the conclusions to which we have come will be equally applicable to all the defendants.
*91 The form of the contract upon which Youngs and Laverty are sought to be charged, is that of the endorsement of promissory notes, and the notes being negotiable, it is only as endorsers that they can be made liable. The character of their engagement cannot be changed into that of a special guaranty, and had the plaintiffs failed in their proof of presentment and notice, these defendants would have been entitled to a verdict on that ground alone. (Scarbury v. Hungerford, 2 Hill, 80; Hall v. Newcomb, 3 Hill, 233; Purser v. Luqueer, 4 Hill, 420.)
It makes no difference, in this respect, that the endorsements were for the accommodation of the makers, nor that they were intended as a security for the performance, by the latter, of certain conditions in favor of the plaintiffs. The legal character of the contract remains the same, and no objection can be taken to it under the statute of frauds. (Parks v. Brinkerhoff, 2 Hill, 663.)
If the endorsements are to be treated as having been made for the general accommodation of Caffe & Cutter, without restriction, they could be available in the hands of any party who should receive the notes from Caffe & Cutter, for value, and on this theory, of the case, the plaintiffs became holders, for value, when they gave the credits and accepted the drafts in question, and would be entitled to recover as such holders for value, irrespective of any rights they might have against the parties, under the arrangement with Caffe & Cutter. This theory would by no means be an unreasonable one. There is no evidence to connect the endorsers as parties to the arrangment between Collomb, the plaintiff’s agent, and Caffe & Cutter, and it is only as matter of inference from the testimony, that this court can hold that they even knew to what purpose the notes were to be applied, and it would not be straining the case to treat it as the ordinary one of general accommodation paper, without restriction as to its use, in the hands of a bond fide holder for value.
It would, however, be more consistent, I think, with the real character of the transaction, to consider the endorsements on the defendant’s own theory, as accommodation endorsements for a special purpose, and the' defendants as cognizant of the general purpose to which the paper was to be applied, and I think their knowledge is to this extent fairly to be inferred from the evidence. This does not alter their legal position, so far as the form *92 of the contract is concerned; their liability would still be that of endorsers merely, but whether this liability could be enforced against them, would not depend upon the mere fact of a default on the part of the makers in paying the notes at maturity. The question would involve an inquiry into the nature and character of the entire transaction. If the notes were deposited for a special purpose, under an arrangement, the particulars of which had been left by the endorsers to Collomb, Caffe & Cutter to adjust, between themselves, then their liability would depend upon the fulfilment of the stipulations which might have been agreed upon between those parties.
It becomes necessary, therefore, to inquire into the circumstances under which, and the conditions, if any, upon which the notes came into the plaintiffs’ hands.
That the notes were deposited by Caffe & Cutter with Collomb for a special purpose (the security of the credits) is undeniable, and I shall assume it as equally undeniable, because the evidence warrants it, that the endorsers knew the general purpose for which they were deposited, and made their endorsements in order to enable Caffe & Cutter to effectuate that purpose. There is not a particle of evidence, however, to show that either of them ever prescribed the mode in which the credits were to be availed of by Caffe & Cutter, or that they imposed any restrictions upon the use of the credits, or of their endorsements as a security therefor, or that they were ever informed of the particulars of the arrangement with Collomb after it had been made, in June, 1849, or at any subsequent period. Their object appears to have been, to give to Caffe & Cutter, in the particular transaction, the benefit of their endorsements as a security for the credits in question, in the way of a general accommodation, leaving the entire arrangement of the particulars to those gentlemen and the plaintiffs with whom they dealt.
If such was the object of the endorsements, it would practically be a matter of indifference to the endorsers, how the bills were in fact drawn, or how they were agreed to be drawn, since the general object of accommodation would be equally secured to Caffe & Cutter, whether the drafts were drawn in their own names, or in the name of Smith Cutter, jr., or in that of Allain & Co.; the mode of drawing would be a matter in which they could have no *93 interest, so long as the notes, to which they were parties, were applied to the purpose for which they had endorsed them.
But the defendants contend that the object of the endorsement was not of the general character above supposed, but that they were made not only for a special purpose, which is conceded, but on conditions and limitations to which they, the endorsers, were, in legal contemplation at least, parties, and that by the failure of these conditions their liability has ceased. They claim for themselves the position of strict guarantors, or sureties for Caffe & Cutter in the transaction in question, and their theory is, that under the arrangement between Caffe & Cutter and Collomb their engagement was limited to such drafts as should be drawn by Caffe & Cutter themselves, or by Smith Cutter, jr., and that the transfer of the credits to Allain & Co., and the drawing of the bills in the name of the latter firm, was an entire departure from, and breach of the conditions of this their engagement.
This raises the question whether, by the terms of this arrangement, any such restriction existed on the use of the credit as should have prevented the drafts from being drawn in the way in which they actually were drawn, that is, in the name of Allain & Co.
The terms of the arrangement are all embodied in Collomb’s letter of the 4th of June, 1849, (the date of the original credit,) taken in connection with the letter of credit itself of that date.
By these it appears that the credit was opened in favor of Smith Cutter, jr., one of the firm of Caffe & Cutter, then in Paris, on the business of the house, and that it was to be availed of by his bills on the plaintiffs at 90 days’ date or sight.
Evidence of usage was offered by the plaintiffs, and rejected in the first case (that of Mrs. Catlett) and received in the other, to show that where a credit is granted to a house in New York, on a foreign house, it is customary for the parties receiving the credit to avail themselves of it by either drawing against it themselves, or by transferring it to other parties, in part or in whole. Whether this evidence was properly admitted or not, may be doubtful, but it is unnecessary to consider the question, as the proof falls short of what is necessary to establish such a custom, and the case does not require a resort to evidence of this nature.. The whole case shows that the credit was really in favor of the firm of Caffe & Cutter, of which Smith Cutter, jr., was a member. *94 Drafts by Caffe & Cutter would have been equally within the scope and meaning of the arrangement, as drafts by Smith Cutter, jr., himself, and we find the plaintiffs putting the same interpretation on the agreement, for in the second letter of credit, the credit is expressly made in favor of Caffe & Cutter. By the terms of the letter they are to dispose of the credit according to custom, (their own of course,) at 90 days’ sight or date. Moreover, the transfer of credits to Allain & Co. was made in the name of Caffe & Cutter, and all that company’s drafts are charged to the latter’s account.
The agreement must be reasonably interpreted. If it was allowable within the meaning of the arrangement, for drafts to be drawn in the name of Caffe & Cutter, then they might properly be drawn in the name, and through the medium of an agent of that firm, which relation Allain & Co. clearly sustained. It was an agreement of convenience, and evidently so intended. I admit that had a special guaranty been subjoined to the letter of credit of the 4th of June, 1849, the surety would have had a right to a literal performance of the terms of the letter, whether material or not. (Dobbin v. Bradley, 17 Wend. 422; Birkhead v. Brown, 6 Hill, 634.) But that is not this case, and it is needless to speculate upon the supposed cases.
It would be an unwarrantable stretch of the evidence to say that it was an understood condition of these defendants’ liability that the credit was to be availed of only in bills drawn by Smith Cutter, jr., or in the name of' Caffe & Cutter.
It is conceded that they occupy the position of sureties to Caffe and Cutter, but not in the sense of strict guarantors of an agreement containing restrictions and limitations and to which they were parties. They are sureties, as all accommodation endorsers are, who entrust their names to parties for the purpose of a general accommodation, without restriction, though in a particular transaction, and the cases of Powell v. Waters, (17 J. R. 176;) Bank of Chenango v. Hyde, (4 Cowen, 567;) and Bank of Rutland v. Buck, (5 Wend. 66,) show, that where general accommodation is the object, even if it be understood by all the parties that the accommodation is to be secured in a particular way, a strict adherence to that mode is not essential, nor a departure from it a misapplication of the paper. We conclude, then, that even if these defendants had been cognizant of, or in any sense, parties to the *95 arrangement' between the plaintiffs and Caffe and Cutter, the evidence does not warrant them in saying that the mode in which the drafts were actually drawn, was a violation of the conditions of that arrangement.
But it is objected, that by the transfer of the credits to Allain and Co., Caffe and Cutter not only departed from the terms upon which the credit was created, but that they thereby relinquished all control over the credits themselves. This view is not supported by the evidence. This transfer was not a sale or negotiation of the credits—Allain and Co. were merely the agents of Caffe and Cutter, for the purchase of their goods in Paris—every one of their drafts is expressed to be for value received in merchandise, and was directed to be placed to the debit of Caffe and Cutter’s account with the plaintiffs, and was so debited. Caffe and Cutter are throughout recognized as the debtors in the account, and the drafts were, to all intents and purposes, the drafts of that firm. If, then, the objection to the mode in which the drafts were drawn fails, the inquiry remains, what were the conditions upon which these endorsements were to become available in the hands of the plaintiffs, in other words, in what event were these endorsers to become liable? and has this event occurred?
By the arrangement between Collomb and Caffe and Cutter, the latter were to remit by the English steamer, in good bills on London or Paris, to be approved of by Collomb, to cover the plaintiffs, for such acceptances as they should make under the credits, and such remittances were to be made, so as to reach the plaintiffs at least fifteen days before their acceptances should become due. The credits were to be renewed so long as Collomb held the security of Youngs and Laverty, provided the remittances were made.
"When the second credit was given, (June, 1851,) a new note, endorsed by Youngs and Laverty, or by one of them, was deposited with Collomb for the amount of the credit, and when the final credit of 40,000 francs was granted, their endorsement for that amount was also deposited as security, and no change or variation had occurred in the original terms or conditions of the credit, but they remained precisely as they had been agreed upon when the first credit was opened.
The contingency then upon which these endorsements were to *96 become available to the plaintiffs, was the failure of Caffe and Cutter to remit bills on London or Paris, to be first approved of by Collomb, in Hew York, in such time as to reach the plaintiffs at least fifteen days before the maturity of the acceptances.
The bills were to be approved of by Collomb, before being remitted, so that the default would, in fact, occur whenever Caffe and Cutter failed to present bills to Collomb, in Hew York, for his approval, in time to allow them to be remitted so as to reach Paris fifteen days before the maturity of the plaintiff’s acceptances. Has the contingency happened, and to what extent have the defendants become liable ?
Caffe and Cutter appear to have drawn under the first and second credits, from time to time, up to the period when the last credit was given, (12th of October, 1852,) and to have renewed their notes, with the defendants’ endorsements, to cover the amount of their drafts, so that at this last period, Collomb held such renewal notes for the full amount of the then existing credit for 85,000 francs.
This covered a period of nearly three years, and considering that the period between the second and last credits exceeded a year, there can be no pretence for saying' that the two original credits were not both, of them of a permanent character, or that the defendants did not know and assent to their being so.
We are not informed what was the state of the aocounts between the plaintiffs and Caffe and Cutter, on the 12th of October, 1852, when the last credit was given, but at that time Collomb held the defendants’ endorsements (in renewal notes) to the full amount of the two previous credits. A new arrangement was then proposed by Caffe and Cutter, and assented to by the plaintiffs, by which all the credits were to be consolidated into one, and made an aggregate credit of 75,000 francs, to continue for at least one year, and upon the same terms upon which the original credit had been granted, and although no notice appears to have been given to the defendants of this new arrangement, they were undoubtedly aware of it, for we find their endorsement for the increased amount (40,000 francs) immediately furnished, upon the completion of the arrangement.
We know nothing of the state of the accounts between the parties after this final consolidation of the credits, until June, 1853, *97 when a balance of over 46,000 francs was dne from Caffe & Cutter to the plaintiffs.
This balance was entirely extinguished by remittances of Caffe & Cutter in July and August following. At this period, neither of the notes in suit was due, though outstanding, and had the transaction terminated here, the defendants’ liability would have been at an end; but about this period, commenced a new mode of using the credits, and a new series of drafts and acceptances, which has given rise to the present litigation.
In June, July, and August, 1853, Caffe & Cutter direct the plaintiffs to transfer the whole of the credits to Messrs. S. Allain & Co., who, thereupon, drew in five different drafts, commencing August 1st, and terminating October 12th, 1853, for the full, amount of the 75,000 francs, all which drafts were accepted by the plaintiffs before the maturity of the notes in suit.
Caffe & Cutter have made no remittances to cover these acceptances, or either of them.
The first of them (20,000 francs) fell due, and was paid by the plaintiffs just after the maturity of the $8,000 note, and the second of them (for 15,000 francs) shortly after the maturity of the two notes for $2,000 each, and these were the only two drafts which had either fallen due, or been paid, at the time these suits were commenced.
The suits were commenced on the 3d and 7th of December, 1853.
The two first drafts (35,000 francs) were actually paid, as already stated, before the commencement of the suits. The third draft (15,000 francs) fell due, and was paid, on the 19th of December ; approved remittances to meet this acceptance should have reached the plaintiffs at least as early as the 4th of December, which was before the commencement of the suits. In respect to this draft, therefore, there had been a clear default at the time of the commencement of the suits; the two last, each dated 11th Oct., 1853, payable at ninety days, one for 15,000 francs, and the other for 10,000 francs, each fell due and was paid by the plaintiffs on the 9th of January, 1854. In respect to these, if approved remittances had been sent at all, they would have been in time, if they had reached Paris on the 25th of December. The default, in fact, occurred when Gaffe & Cutter failed to exhibit bills to Collomb, in *98 Hew York, for Ms approval in time to be transmitted, so as to reach Paris on that date. What period tMs would have required, at that time, we are not informed, and do not know. In respect, therefore, to these two drafts, it cannot be said that at the commencement of the smt, Caffe & Cutter were in default. They were, however, paid before the time. It is clear that there had been a default on the part of Caffe and Cutter, under their agreement with the plaintiffs, in respect to all the drafts except the two last, at the time these suits were commenced.
The question then arises, to what extent are the plaintiffs entitled to recover in those actions ?
The defendants contend that, in any event, they are liable only to the extent of two drafts, (35,000 francs,) which had matured and been paid at the time of the commencement of the actions; and it is further contended on the part of Mrs. Catlett, that the $8,000 note was applicable exclusively to the credit of 40,000 francs, and that, therefore, the plaintiffs can only recover, as against her, the amount of the $2,000 note, the only one, as she claims, on wMch Lavertyhas been sued, wMch is applicable to the drafts for the 35,000 francs.
The plaintiffs, on the other hand, claim that they are entitled to judgment for the full amount of the notes against the parties to them, that is, as against the executrix of Laverty, the amount of the two notes, one for $8,000 and the other for $2,000, (50,000 francs,) and as against the other defendants, the amount of all the four notes, $15,000, (75,000 francs.)
When the credit was finally raised to 75,000 francs, all discrimination in the amounts of the several credits which constituted the aggregate sum appears to have been dropped, and though the $8,000 note is expressed in Collomb’s letter to plaintiffs of 12th of October, 1852, to be the guarantee upon the 40,000 francs augmentation of the previous credits, the meaning of the expression must be gathered from the whole of the facts then existing. It was a final arrangement for a permanent credit for the larger amount; and the notes then held, as well as the $8,000 note then received, were to be considered as the guarantee for the fulfilment of the conditions originally agreed upon, when the first credit was opened.
It would be unreasonable to suppose that the parties intended *99 that each note should remain as a security for the particular credit only, on which it had been originally given, which would necessarily lead to endless confusion, unless care was taken that each draft was drawn upon a particular credit. On the contrary, the evidence of Collomb is express, that the notes were deposited as security for all the credits, and that the drafts were drawn against the credits generally, without discrimination.
I conclude, therefore, that such was the understanding of the parties, and that the notes must all be treated as on the same footing, and as constituting together a common security for the entire amount of credits. In legal effect, the case is the same as though the notes had all been consolidated into one, or as if, instead of endorsed notes, the form of the security had been a bond for the entire amount, withLaverty & Youngs as sureties, and conditioned for the performance, by Caffe & Cutter, of the stipulations of their agreement with Collomb.
It is like the case of a suit on a bond payable in instalments, in which, on default in payment of one instalment, the plaintiff takes judgment for the whole penalty, and issues execution for the amount actually due, and so from time to time, under leave of the court, as subsequent instalments become due.
It follows that, on default of Caffe & Cutter, in making remittances to meet any one draft, the plaintiffs became entitled to sue upon all the notes, and to take judgment for the aggregate amount of all, as they would have been entitled to do, had the security been in the form of a bond, and, as all the drafts had been taken up and paid by the plaintiffs before the verdict was obtained, and it is conceded that Caffe & Cutter never made a remittance to meet either, there can be no objection to the plaintiffs taking their judgment for the full amount of the notes in each suit, and issuing execution accordingly, provided that the whole amount to be levied under the two judgments do not exceed, exclusive of costs, interest and charges, the sum of the said acceptances and commissions, with interest thereon; and provided further, that the judgment against Mrs. Catlett is to be levied of property in her hands, or to come into her hands as executrix, and out of her individual property.
An objection was taken, at the trial, that the plaintiff’s firm was changed, in July, 1852, by the withdrawal of Respinger, one of *100 partners, and the accession of Krauss, a new member. Whatever force this objection might have had, under other circumstances, I do not think it well taken here. The change took place before either of the notes in suit was made, and the firm continued the same.
An objection was also taken, on the trial, to the sufficiency of the proof of the endorsement, by Le Roy de Chabrol & Co., of the drafts, of the 1st of August and 11th of October. We think this objection was properly overruled.
The acceptance of the draft is not denied, nor is the omission to make remittances, to meet the acceptances, denied. It was that default, on the part of Caffe & Cutter, which was to render the defendants liable, on their endorsements. Whether the holders could have recovered, against the drawees, in a suit upon the drafts, on this proof of the endorsements, may be questionable. But that cannot affect the question of the liability of Caffe & Cutter, by reason of their failure to make remittances.
An objection was also taken, at the trial, by the counsel for Mrs. Catlett, to the reading of the depositions, under the commission, on the ground, that the cross-interrogatories were not sufficiently answered. We think the objection was properly overruled, as it is very clear that all the cross-questions are, in fact, answered; and, so far as the objection points, fully answered. The special question, omitted to be fully answered, should have been pointed out. But, apart from this, the defendant's counsel was aware of the defect, some months before the trial. If the objection had been deemed sufficiently serious, a motion should then have been made to quash the return of the commission. If that motion had then been made, and prevailed, the plaintiff would have had time to remedy the defect, by a second commission, before the trial. It would be unfair, to prejudice him by a surprise, on the trial, under such circumstances. (19 Wend. 487.)
For the like reason, we think the objections, on the'part of the other defendants, though more serious in character, should not prevail. Good faith and fair practice required, under the circumstances, that they should have been taken before the trial.
Judgment must be for the plaintiffs, in each action, in conformity with the views expressed in this opinion.