By the Court.—Van Vorst, J.
This action is brought to recover thirty thousand dollars claimed *297 under a policy of insurance written by the defendants upon cargo delivered by plaintiff upon the schooner Samuel T. Keese ; the vessel and cargo being wholly lost before reaching the port of destination. The answer of the defendants denied the cause of action, averred in the complaint, and especially the shipment of the cargo, and the value claimed for same, the prosecution of the voyage, the fitness or due fitting out of The vessel, and the loss by any sea peril as having been made or incurred in good faith, and also contained a ■separate answer averring that the insurance was fraudulently obtained upon false and fraudulent representations ; that the voyage was never designed for the purpose of being completed or attempted to be completed. That the loss was not caused by any adequate sea peril, but was planned from the outset. The answer also claimed among other things as relief, that the policy of insurance might be declared to have been fraudulently obtained by the plaintiff, and to be void and surrendered and canceled, or that the valuation might be reformed. A reply was interposed by the plaintiff, putting in issue the affirmative matters and nlaims set up in the answer.
The issues came on for trial before one of the judges ■of this court and a jury.
Before the jury was impaneled, the counsel for the ■defendants objected to any trial being had by the jury, “ before or without a trial of the counter-claims.” The learned judge overruled the objection, and decided to try any issue coming properly before the jury and reserve any issue to be tried before the other branch of the court, suspending the judgment, in the meantime, if it became necessary. The counsel for the defendant excepted. After the rendition of the verdict, defendants’ counsel requested the court to stay proceedings on the verdict, and reserve the equitable counter-claim for trial *298 at the special term of the court. The request was refused, and defendants’ counsel excepted.
The facts set up in the answer of fraudulent overvaluation, unseaworthiness, and connivance in the loss by the plaintiff and in issue, were all properly triable by the jury.
Although to a purely legal claim an equitable defense may be interposed, yet there is no reason why the matters out of which such equitable defense arises may not be tried by a jury.
Such defense should rest on issuable facts capable of trial, and they do so in this instance. It was the design of the Code to provide an uniform mode of trial. There is nothing in the nature of an equitable defense or counter-claim interposed to a legal cause of action, which renders it unfitted to be tried by a jury. This is a common-law action, and was entitled to be tried by a jury. Equity cases may be tried in the same way in the discretion of the court. We are not to suppose that the matter presented by the complaint is to be tried by one tribunal, and a defense presented by the answer by another (Getty v. Hudson River Railroad Company, 6 How. 269).
The character of an action is determined by the complaint (Welsh v. Darragh, 52 N. Y. 590).
The disposition of • the matters raised by the defendants’ motion rested in the discretion of the court at best. And it is difficult to see how any injury could have followed the direction given by the court. For if either of the matters set up in the answer was established on the trial to-the satisfaction of the jury, such as original unseaworthiness, fraudulent overvaluation or connivance in the loss, the plaintiff’s claim would be entirely defeated, and it was the same matter upon which the defendant relied for the cancellation of the policy. If, on the other hand, these defenses should *299 fail, the plaintiff would be entitled to a verdict, as the policy would stand unimpeached.
And in this same connection it may be well to notice here another objection taken by the defendants’ counsel at a later stage of the proceeding.
At the close of the case, the defendants’ counsel moved to have two issues distinctly submitted to the jury. One “what was the value of the insured cargo at the time of the shipment; ” and the other, “whether they found for the plaintiff or defendants.” Which the court declined to do, “ without the consent of the plaintiff’s counsel.”
To this refusal the defendants’ counsel excepted.
The court had the power without doubt to submit to the jury the questions involved in the defendants motion, and to ask for a finding thereon by the jury (Code, § 161). But the submission of special questions of fact to the jury in addition to the issues generally, is a matter of discretion with the court (Taylor v. Ketchum, 5 Rob. 507; Hackford v. N. Y. C. & H. R. R. R. Co., 53 N. Y. 654).
It being a matter of discretion, a refusal to allow the application is no ground of error.
The counsel for defendant, commenting upon the language of the judge, that he would do so “with the consent of counsel for the plaintiff, but could not without,” urges that the judge placed his unwillingness upon a want of power. We can not so construe the language of the judge. What he meant was, with the consent of the plaintiff’s counsel he would do it, otherwise not. Such is the fair construction of the words used. And if the defendants’ counsel attached any other meaning to the words, such as indicating a want of power, he should have called the attention of the judge to the matter at the time.
Yow, while it may appear to us that there was nothing unreasonable in the request of the defendants’ *300 counsel to have these questions submitted to the jury under the circumstances or the case,- yet the refusal of the judge to do so affords no valid grounds for disturbing the judgment, as the judge’s charge in the end substantially submitted to the jury the consideration of the very facts, which would form the basis of an answer to these questions, and they were necessarily involved in the decision of the jury. We have here considered the questions presented by these two exceptions, because they appeared to be naturally connected, and to involve similar consideration, although not in the chronological order of the incidents of the trial. When the plaintiff rested his case, the counsel for the defendants moved for a nonsuit on the grounds “that the plaintiff had not shown that he was entitled to the property or the possession thereof, that its value had not been proven, and that the loss appeared by the testimony on the part of the plaintiff to have occurred from defects of the vessel, or other causes, without excess of action of wind or sea, or anything amounting to peril of the sea.” The motion was denied, and the defendants’ counsel excepted, and at the close of the case the defendant renewed the motion on the grounds before stated, and also “that it then clearly appeared that the interest is not in the plaintiff alone.” These are the only grounds upon which the motion for nonsuit or dismissal of the complaint was based. The motion was denied, and the defendants excepted. The questions involved in the defendants’ motion may be stated as follows, and will be considered in their order.
1. The plaintiff was not entitled to the property or its possession, and that the interest was not in him alone.
2. Its value had not been proven.
3. That the loss occurred from defects in the vessel, or other causes, without peril of the sea.
Evidence having been adduced, by the plaintiff, of *301 the purchase, by himself, of a large portion of the cargo, and the payment therefor, it was not for the judge to assume that he was not the party in interest, nor entitled to the possession thereof. If there was any presumption, it would be contrariwise as to such portion of the cargo. Of a portion of the cargo, such as was obtained from Herman Boker & Co., although entitled to the possession, the plaintiff was not the absolute owner of same. Boker & Co. were really the owners.
The portion of the goods obtained from Boker & Co. were consigned to plaintiff, for sale in Mexico, free of all expenses for shipping to Boker & Co. Plaintiff was to bear these expenses, and was to sell the property in Mexico, at the best possible advantage, but not below the “invoice price” unless specially directed by Boker & Co., in which case they were to bear the loss. The profits arising from the sale, if any, were to be equally divided between Boker & Co. and the plaintiff. In case these goods were not sold, plaintiff was to return the same to Boker & Co., free of all charges to them, or pay for the same the “invoice price” thereof. The invoice value of this portion of the cargo was claimed by plaintiff to be fifty-two thousand eight hundred and forty-eight dollars ; which invoice value is sustained by the affidavit of Herman Punke, one of the firm of Boker & Co., in evidence, who states such sum was the “invoice value of the same,” and which value was adopted in effecting the insurance. Under the obligations of the plaintiff to Boker & Co., he was certainly entitled to the possession, and had the right to dispose of these goods. In case of a failure to sell them for the invoice price, he was bound to return them, and was liable for their loss.
The plaintiff, under such circumstances, had an insurable interest in this portion of the cargo,—an interest commensurate with its entire value, in the event of its *302 loss,—for, if not returned to the consignors, he was liable to pay for same at the “invoice price” (1 Pars, on Mar. Ins. 161, and note; Lucena v. Crawford, 2 Bos. & Pull. N. S. 269). An insurable interest does not necessarily imply an absolute right of property in the thing insured (Hancox v. Fishing Ins. Co., 3 Sum. 140 ; De Forest v. Fulton Fire Ins. Co., 1 Hall [N. Y.] 84; Chase v. Washington Ins. Co., 12 Barb. 595). Unless there had been some fraudulent representation, at the time of the insurance, in regard to the absolute ownership of this portion of the cargo, and which was a question for the jury, the fact that Boker & Co. had an interest therein, to the extent of one-half the profits to be realized on their sale, was no reason why the plaintiff should have been nonsuited. Nor does it appear that the witness, Tooker, who effected the insurance for the plaintiff, made any direct affirmation or representation in regard to the ownership of the goods. He claims to have made no statement or explanation, except as contained in the written application, which is silent on this subject. Plaintiff had an interest, in the consigned goods, against all except his principals. In addition, the application for the insurance in writing, and the policy issued thereon to the plaintiff, was “on account of whom it may concern.” In Walsh v. Washington Ins. Co. (32 N. Y. 427), it was held that a policy of insurance, issued on account of all the owners, ordinarily enures to the benefit of all the owners; and, on a policy in that form, the person to whom issued could maintain an action thereon, in his own name, in the behalf of all the owners (Qode, § 113; 1 Pars, on Mar. Ins. 524; Jefferson Ins. Co. v. Cotheal, 7 Wend. 72; 2 Duer on Ins. 29, note a).
. The judge distinctly charged the jury, without objection or exception, that they were to inquire whether the plaintiff had an insurable interest, and its extent; *303 and whether the goods claimed to be lost were placed upon the vessel.
In regard to the second ground of the motion for a nonsuit, that the value of the property had not been proven, its cogency depends mainly upon the character of the policy. The application for this insurance is dated September 17, 1867, and was made by Johnson & Higgins, agents for the plaintiff. It states that insurance is wanted, by plaintiff, “for account of whom it may concern,” for thirty thousand dollars, on merchandise, military goods, &c., valued at two hundred and five thousand dollars, on board the schooner Samuel T. Keese. On September 25, the value was changed to two hundred and thirteen thousand dollars, by order of the vice-president of the defendants, on the application of the agents of plaintiff. The policy itself bears the date of September 17, the day on which the application was made. The change in valuation appears in the policy. The vessel sailed on September 18. When the application was made, and the policy dated, the insured merchandise was chiefly, if not wholly on board the vessel. The policy in question was a “ valued ■one” It is to be assumed that the value was agreed upon when the insurance was effected. Upon no other reasonable ground can it be accounted for, that the value is inserted in the policy. After the date of the application, and before its acceptance, the defendants, had they been so minded, had opportunity to make inquiries to ascertain the value, and to examine the cargo on board, as the basis of insurance. The issuing of the policy thereafter, would be evidence of an agreement of the parties upon such value. Such valuation would presumptively represent the true value, unless fraudulent representation was proved.
The object of a valuation, says Lord Ellenboroug-h, is to fix an estimate on the subject insured, and to suspersede the necessity of proving the actual *304 value, by specifying a certain sum as the amount of that value (Forbes v. Aspinwall, 13 East, 326, 327 ; Shaw v. Felton, 2 Id. 109).
If there was a fraudulent overvaluation, it was for the defendant to establish the fact. But as to whether there was a fraudulent overvaluation, was not a question for the court to determine, but was for the jury. An overvaluation is not líper se” evidence of fraud,, but is always a circumstance .proper for the consideration of the jury in determining the question of fraud. If there was fraudulent overvaluation, the policy would-be void. The rule is different as to the necessity for proof of the value of the subject of insurance under an open policy, for in such case the assured must prove the actual value of the subject of insurance. Under a valued policy, he need never do so, the valuation in the policy being conclusive between the parties, except in case of fraud, and the burden of establishing fraud rests on the insurer (1 Arn. on Mar. Ins. [Boston Ed. 1850] § 124; Whitney v. Am. Ins. Co., 3 Cow. 210; S. C., 5 Id. 712 ; 2 Phil. on Ins. § 1183).
In case of an overvaluation of the merchandise by the insured, fraud is not thereby necessarily established ; if gross, it affords presumption of fraud, but whether or not it was fraudulently made, was a question for the jury (Pleasants v. Maryland Ins. Co., 1 Sumn., 56; Alsop v. Commercial Ins. Co., 1 Sumn. 451; 1 Pars. Mar. Ins. 262; Clark v. Ocean M. I. Co., 16 Pick. 289; Robinson v. Manufacturing Ins. Co., 1 Metc. 146 ; Gardner v. Columbia Ins. Co., 2 Cranch, 550.
The valuation of the merchandise, therefore, appearing by the application and policy, the judge would', not have been justified in nonsuiting the plaintiff for a. failure to prove the same, but it was incumbent on him, in the event that an overvaluation was proved to have been made by the plaintiff, to submit the question to the jury for its determination on the question of fraud. *305 For in order to have granted the plaintiff’s motion for a nonsuit on the ground that the value of the property had not been proven under a valued policy, the judge must have decided that the evidence indisputably showed that the property had been overvalued, and that the overvaluation was fraudulent.
Under such conditions, he should have held that the policy itself was void, by reason of such fraudulent overvaluation and for that reason have directed a nonsuit, or a verdict for the defendants. But the judge was not asked to nonsuit on that ground, nor for such direction as to a verdict. The case of Haigh v. De La Cour (3 Camp. 319), to which we have been referred by defendants’ counsel, was one of fraudulent overvalua tion, and has marked characteristics. Fictitious invoices and interpolated bills of lading were produced to the insurers, on which the insurance was adjusted. The invoices and bills represented that goods over the valuation of five thousand pounds had been shipped. In fact, goods to the value of one thousand four hundred pounds only had been shipped. The ship was afterwards run away with, and the cargo disposed of by a person whom the insured had put on board in quality of supercargo.
There does not appear to have been any controversy about the facts, which clearly established a fraudulent design from the beginning.
Mansfield, J., decided, that if the insured intended from the beginning to cheat, nothing could be recovered. The fraud entirely vitiated the contract, and the plaintiff was nonsuited. But here no such distinct ground was urged, nor, in the event that it had been urged, could such direction have been given by the judge. The principal questions, as to whether there had been any overvaluation, and if so, whether the same was fraudulent, were in dispute, and were questions of fact.
*306 The valuation of the merchandise had been derived by Tooker, the clerk of Johnson & Higgins, who effected the insurance, from the plaintiff. Such value he understood to be “just the invoice cost, as near as could be ascertained.” Tooker adjusted the value with the defendants at the sum above mentioned. There was evidence given of the price paid by plaintiff for the separate lots purchased, which, together with the “invoice value” of the goods consigned by Boker & Co., constitute the aggregate value of the whole shipment; to which may be added freight and insurance.
Ames, Mullen, and other vendors had testified as to the price paid them for goods sold, and the plaintiff himself had sworn that the prices charged, in the claim presented to the defendants for the goods purchased, had been paid. Of the' consigned goods, one of the firm of Boker & Co. had testified to the invoice value.
The goods were implements of war. The value of such articles fluctuates, and depends upon uncertain demand. In times of war their value increases, according to the urgency of their want.
The evidence shows that they were for use in Mexico, in 1868, to which county the plaintiff had made previous shipments of arms and munitions of war, in the interest of the Mexican government. Of these arms, some had either been previously used, or were of a model not in use by the United States government, and were called “unserviceable.” But they were, notwithstanding, “ serviceable for use.”
The defendants introduced evidence tending to show that the prices charged were greater than those for which similar articles had been sold at government sales in this country previous to the shipment in question, and that some of the articles claimed to have been ¡shipped had been purchased at such government sales *307 by the persons from whom the plaintiff derived his title.
The evidence also showed that a large proportion of the goods had been purchased by the plaintiff for Mexican bonds at sixty cents on the dollar, while the bonds themselves had no certain market value.
The payment for any part of the goods in Mexican bonds at an agreed price, was not necessarily evidence of a fraud in the plaintiff’s valuation. Whether fraudulent or not, would depend upon the agreement, understanding, and intentions of the parties. If the goods were understood to be sold at a price above their actual value, because paid for in Mexican bonds at sixty cents on the dollar, and were invoiced at such enhanced price, because so paid for, it would without doubt be an overvaluation of which the defendants could justly complain.
The sabres purchased from Ames, at Springfield, were paid for in Mexican bonds at sixty cents, and yet the vendor testified that he sold similar articles at about the same price, payable in cash, to the U. S. government, during the late civil war.
But this question, as also the others involving the subject of overvaluation, and fraud to which allusion has been made, were for the consideration and determination of the jury under the evidence, and upon this understanding of the respective duties of court and jury, the case appears to have been tried and finally submitted.
The defendants’ counsel by his requests subsequently made, asked that the jury be charged “that a fraudulent valuation presented by the assured avoids the policy, and that fraud may be presumed from gross overvaluation, and that payment in unmarketable bonds is no evidence that the goods were of the value of the price paid,” and the jury was so charged.
The third ground of the motion for the nonsuit was *308 that the loss occurred from defects in the vessel, and. without perils of the sea.
This request called upon the judge to take from the jury two questions upon which evidence had been given by both parties, viz : the condition of the vessel at the time of her insurance and entering upon her voyage, and the causes of her subsequent loss. It was. proved by a witness called for the plaintiff that the Keese hauled'into the stream, preparatory to her departure on September 17, 1867. Her sails, rigging and. appurtenances were good; her pumps were not tried, her limber boards were up, and there was no water in her. The captain testified that both pumps were in order. When in the stream, her pumps were tried and. could get no water, she had a crew of eight men, enough for her voyage. Before taking the risk the defendants had themselves classified the vessel at “A 2|-.”
The defendants had in their employment surveyors- and inspectors, to whom, when applications for insurance were made, was referred the subject-matter for inspection and survey. Upon the report of the surveyor, and such other investigation as was thought to be necessary, insurances were made. Farnham, a surveyor for thé defendants’ company, made a memorandum with regard to the vessel before this risk was taken. There was- other evidence on the plaintiff’s behalf, with regard to the condition and appointments of the vessel, and as to seaworthiness.
The vessel was lost on October 13, 1867, twenty-six days after she left the port of Hew York, near the Campeachy Banks, and when within three hundred and fifty miles of Yera Cruz, to which she was bound.
In Walsh v. Washington Marine Ins. Co. (supra), it was held, that whether a vessel insured was seáworthy at the inception of the voyage, is ordinarily one of fact for the jury; but if the vessel founders, without stress of weather, or other adequate cause *309 ■soon after leaving port, the presumption is that the inability existed before setting sail, and arose from some latent defect, which rendered the vessel unseaworthy. But no such" présumption exists when it appears affirmatively that the ship was seaworthy on leaving port, and had encountered marine perils, such as might disable a stanch and well-made vessel (Wright v. Orient Mut. Ins. Co., 6 Bos. 269). The evidence of the plaintiff, and the classification of her by defendants, do not present the Keese as a first-class vessel. She was a “whitewashed vesselthat is, she was an American vessel, sailing under .British colors. This fact affected her value. She had been purchased by her captain, in August, 1867, just before entering upon the voyage in which she was lost, for four thousand dollars.
The evidence introduced by plaintiff shows, that the vessel encountered severe weather in crossing the Gulf stream. In the neighborhood of Abaco, she met a severe gale, compelling her to lay for twenty-four hours under storm-canvas, and, when she reached the •Campeachy Banks, in the Gulf of Mexico, a “norther,” with a heavy gale, overtook her. On the night of October 12, she sprung a leak. Hands were called to the pumps, and they continued to pump until nine o’clock next morning, with the usual rests, when the ■crew came aft, and said they were exhausted and could not work the pumps any longer. A life-boat, which had been shipped on the Keese for Vera Cruz, was put overboard between twelve and two o’clock in the afternoon, the pumps being kept going until about twelve. The men from the Keese.got into the life-boat, and remained near the Keese until "about eight o’clock in the evening, when she sunk, and, with her cargo, was wholly lost. ■
Such is the substance of the evidence of the master and mate of the vessel.
*310 The crew then started for Yera Cruz in the life-boat, and, after being four days and three nights in the boat,, on the open sea, they reached Yera Cruz; and, on October 17, 1867, the captain and mate, with three of" the seamen, appeared before A. S. Calderon, the United-States vice-consul at Yera Cruz, and made, signed, and by oath verified a protest, giving the particulars of the-disaster, and of their utmost endeavors to preserve the-vessel and cargo. It is apprehended that, under such, circumstances, it was not for the judge to decide that the loss of the vessel occurred from her defects, and without peril of the sea ; and none the less so, for the-reason that three of the seamen, who had signed and verified the protest at Yera Cruz, on the day of their-arrival there, had appeared and testified, on the trial in. this action, to an entirely different version of the circumstances attending the loss of the vessel; in substance, that the vessel was not seaworthy when she started on her voyage ; that she was unnecessarily-deserted by the master and mate, without proper-efforts to save her, and could have reached Yera Cruz, in safety. It is difficult to understand upon what principle, and for what solid and satisfactory reasons, the-judge on the trial should have accepted these last statements of these witnesses, in direct opposition to-their solemn oaths “on the Holy Evangelists, sev erally, voluntarily, and freely deposed, declared, and. stated,” and accepted in their stead their later statements, in direct opposition, in like manner sworn to, and at the same time reject tne testimony of the captain and mate of the vessel, who were the last to leave her-in her sinking condition. On the other hand, it was-more reasonable, under the circumstances, to leave this question, the credibility of the witnesses, and the reliability of their evidence, for the determination of the-jury. These considerations lead to the conclusion that,. *311 upon neith ¿r of the grounds urged by the defendants* counsel, was it proper to nonsuit the plaintiff.
We come now to consider the various exceptions, taken by the counsel for the defendants to the refusal of the judge to charge several propositions to which his attention was called, which will be examined in their order.
The defendants’ counsel asked the judge to charge-the jury as follows :
First. 11 That unless otherwise expressed or agreed, the value insured is the value at the place of shipment. And in stating a valuation for purposes of insurance, the assured is required, in good faith, to inform the underwriter if the valuation stated is intended to cover a substantial excess above the shipping value.”
The judge charged that the jury should take only the fair market value in the city of Sew York; and further charged “that any fraudulent overvaluation, therefore, for any purpose whatever, is sufficient to avoid the policy: such as any false statement of value, fictitious invoices, or any false receipts. So any false representations made in respect to the risk; or any fraudulent concealment of facts which it was important and necessary the underwriters should know, before-they were called upon to take the risk; or any fraudulent concealment of facts in regard to the value of the-property, is sufficient to avoid the policy. That the plaintiff was bound, in good faith, to give all the information he had in regard to the property, and not to perpetrate by false statement, or concealment of fact, a fraud upon the defendants. The plaintiff has not included any profits in the valuation of the property, but simply taken the cost price, and added the-expenses of transportation, insurance, &c., which makes up the gross amount to two hundred and thirteen thousand dollars. You have a right to look at the character of the goods, at the circumstance of the payment in *312 bonds, and at any sales made, in this market, of that species of goods, and from all of them to say whether the property was so grossly overvalued, by the assured, as to satisfy you that the valuation was a fraudulent onei The cost of the property is not necessarily its fair value; nor is the nominal price paid for them, in Mexican bonds, a fair criterion of value.” It is apprehended that the above charge, on the subject of value, substantially covers the request, or all of it which was proper to be charged. The evidence, on the part of the plaintiff, .being as stated by the judge, that the amount fixed as the value was only the “invoice,” or “cost price” of the goods, and not designed to cover anything beyond, except the expenses of transportation.
If there was any evidence that the sum stated, in the plaintiff’s application, included any substantial excess over the shipping value, or cost, such as payment for the same in Mexican bonds, false invoices, or otherwise, then it was evidence of fraud, and would come within the denomination of false statement, or concealment, which the judge charged would avoid the policy.
By the term “shipping value,” as used in the request of the defendants’ counsel, is doubtless meant the prime cost of the property, in the city of New York, to the plaintiff. That such was his meaning, is indicated by the terms used in the first sentence of this request: “The value insured, is the value insured at the place of shipment, without any substantial excess and also by the terms of the third request, and which the judge charged to be the only value to be regarded by the jury.
The second request of the defendants’ counsel: “That a fraudulent valuation, presented by the assured, avoids the policy. And fraud may be presumed, from gross overvaluation,” Was charged. *313 The third request was as follows: “That instructions or statements by the assured to his insuring broker, prior to the insurance, and for the purposes thereof, to the effect that the valuation does not cover any profits, are evidence that the valuation was stated or represented at cost or value at the port of shipment.”
This request, to be pertinent, assumes that there was evidence that representations, of the character indicated, had been made. The only express representation as to value, is contained in the application of September 17. The sum therein stated as the value, is two hundred and five thousand dollars. This amount, on September 25, was changed to two hundred and -thirteen thousand dollars, and the policy was altered accordingly. The witness, Tooker,—the agent of Johnson & Higgins, plaintiff’s brokers, as already observed, —says he obtained the valuation either from plaintiff or the person authorized by him. The basis of the original valuation to all the other underwriters, was, “ invoice and five per cent., unless otherwise agreed.” Afterward, on the conclusion of all the insurance, he gave the valuation as derived from either plaintiff or the person authorized by him. But the valuation given to the defendants, with whom insurances were the last to be effected, was two hundred and five thousand dollars, which was afterward changed to two hundred and thirteen thousand dollars,—an alteration being made in the application to that effect, by order of defendants’ vice-president, on the application of plaintiff’s agents. In the course of his examination, Tooker says that he was informed that the valuation of two hundred ¡and thirteen thousand dollars was the invoice cost, as near as could be ascertained, and did not cover a profit, as when valued at invoice and five per cent. By the “ invoice price,” in this sense, was doubtless meant the prices at which the goods had been invoiced, to the *314 plaintiff,' by the persons from whom he had purchased or received the goods.
Ordinarily invoice and market value closely approximate and might be considered the one as the equivalent, of the other. But not so necessarily or universally. For between the time of invoicing the goods to the insurer, and their shipment by him there might be a fluctuation in market values.
“ Invoice value,” and “ prime cost,” may more properly be regarded correlative terms.
The judge charged the jury that “ the plaintiff had .not included any profits in the valuation of the property, but had simply taken the cost price, and had added the expenses of transportation, insurance, &c., ■Ac.,” which makes up the gross sum of two hundred and thirteen thousand dollars. That, in connection with what the judge had before charged, would appear to cover all that is contained in the third request, or could properly be asked. .
The fourth request of the defendants was charged. “ That purchases at nominal prices, payable in unmarketable bonds of a foreign country, are no evidence that the merchandise is of the value of such prices, and form no reliable basis of valuation.”
In regard to the fifth request, the judge charged the jury that they were to judge of the credibility to be given to the witnesses, and that “it was a rule of law,' as well as a rule of morality, that the witness who testifies falsely in one particular, is not to be believed in any other.”
That rule applied to each witness, to the plaintiff, who was examined, as well as others. The jury could have had no difficulty in applying this direction to the evidence of the witness Mullen, or the plaintiff himself, and under it would have been obliged to reject their entire evidence if they came to the-conclusion . that they had knowingly testified falsely *315 as to any material statement with respect to the character, price, or value of the insured goods, or any other matter in issue. And if they believed that the statement of value made by plaintiff, or his agent to Tooker, did not represent the invoice or cost price, they would have been justified in rejecting such statement altogether.
The sixth request contains substantially two propositions.
First. That for a loss occurring through unseaworthiness of the vessel the insurer is not liable.
Second. That if the loss occurred through the neglect or incapacity of the master, the insurer is not liable.
The first proposition is supplemented by the ninth request, in which it is asserted that the insured warrants to the insurer, that at the commencement of the risk the vessel is in good seaworthy condition, properly equipped with everything needed for safe navigation.
The second proposition is involved and enlarged ini the seventh request, in which it is further claimed that if the vessel be lost without care, skill, and good faith in navigation, the insurer is not liable.
In regard to the first proposition, the learned judge distinctly charged that “in every contract of insurance there is an implied warranty on the part of the insured that the vessel is seaworthy, is in a fit state of repairs, equipments, crew, and in all other respects to encounter the ordinary perils of the voyage, and that it was necessary for the insured in the first instance to show that the vessel at the time of her departure, was in a seaworthy condition.” This reasonably covers all that is contained in the first proposition, as enlarged by the ninth request.
In regard to the second proposition, what is therein claimed, should the loss have happened through want of good faith, or positive act, or wrongful omission of *316 the master in suffering the vessel to sink without effort to prevent the loss, will be first considered.
The defendants in their answer allegó in substance, that the vessel was suffered to be lost through a scheme to defraud the defendants of the amount insured, in which scheme, as well the plaintiff as the master of the vessel and others were concerned. That the plaintiff having fraudulently overvaluéd and insured the cargo, caused the vessel to sail in an un seaworthy condition, and willingly, through the co-operation of the master, suffered her to be abandoned and lost. That in view of such contemplated abandonment, the vessel had before her departure from ÍTew York, been provided with a boat on deck, completely equipped, and in readiness ftir immediate use, and which boat at the time of the abandonment of the vessel was launched, and at leisure provisioned, and made ready, and that all the persons on board the schooner were placed thereon who, leaving the schooner to sink, sailed into one of the Mexican ports.
It is upon this portion of the defendants’ case, and the evidence upon which it rests, that this second proposition, derived from the defendants’ request to charge, is obviously based.
The learned judge called the attention of the jury particularly to the subject-matter of this'portion of the defendants’ request, and carefully grouped together the various facts and circumstances relied upon by the defendants to establish such scheme to defraud the defendants, by the abandonment and destruction of the vessel and cargo, and charged them, that if they were satisfied, from all the circumstances, that the plaintiff connived at, instigated, or concurred in the destruction of the vessel, by the willful act of the captain, it would constitute a defense, and that the plaintiff would not be entitled to recover.
The judge added, that if the loss of the vessel was *317 occasioned by “the barratrous act of the master and crew, without the connivance or concurrence of the insured, he would not be liable for its consequences, nor. would it constitute a defense. Barratry is one of the risks insured against.”
With regard to so much of the second proposition, contained in the sixth request, as claims immunity from liability on the part of the defendant, if the loss was occasioned through the neglect or incapacity of the master, it may be first observed, that no allegation of negligence or want of capacity in the master is contained in the answer, or set up as a defense. The loss is claimed to have been occasioned, not by the negligent, but by the willful act of the master.
A willful differs essentially from a negligent act. The one is positive, and the other negative. Intention is always separated from negligence by a precise line of demarcation (1 Austin Jurisp. 441-444). The defendants’ case, as presented, in respect to the loss of the vessel, rests upon the willful act of the master, with whom the plaintiff, as is alleged, was a coadjutor.
It is quite well settled, that if the subject-matter insured be lost by a sea-peril, caused by the negligence of the master, the underwriters are liable therefor. And if a ship be seaworthy in the beginning, a subsequent unseaworthiness, caused by negligence, or error of officers or crew, does not take away the responsibility of the insurers. It is the proximate, not the remote cause which is to be regarded in fixing the liability (1 Pars, on Mar. Ins. 381; Dixon v. Sadler, 5 Mees. & W. 405; Redman v. Wilson, 14 Id. 476).
In Mathews v. Howard Ins. Co. (11 N. Y. 9), it is held, that where the immediate cause of the loss of a vessel is a peril expressly insured against, it is not a defense that the negligence of the master and crew occasioned such peril, or brought her within it (1 Pars, on Mar. Ins. 534, note).
*318 The eighth réquest is covered by the judge’s charge in respect to the seaworthiness of the vessel at the commencement of the voyage. There was evidence on both sides in regard to the condition of the pumps. The judge called the attention of the jury particularly to the fact that there was evidence that one of the pumps was out of order. But there was evidence to the contrary. It was for the jury to determine this fact, and also its bearing upon the question of the seaworthiness of the vessel.
There were three specific exceptions taken to portions of the judge’s charge. The substance of these specific exceptions is involved in, and has been considered in what has been said as to the several requests to charge, and need not to be further presented. They were not specially argued on the hearing.
Several exceptions were taken by the defendants’ counsel to rulings made by the judge, in the admission and rejection of evidence. Only those will be noticed to which the attention of the court was specially called by the defendants’ counsel, in his points and on the argument.
The stevedore Halloway, had aided in loading the Keese, and his carman had carted some merchandise to the vessel, and had been authorized to collect the freight. A bill for the freight was produced on the trial, receipted by the carman. Halloway was shown the bill and 'receipt, and was asked whether, by reference to the bill, he could refresh his recollection as to the number of cases brought to the vessel by his car-man. His reply was, he thought he could. He then having looked at the bill, and refreshed his recollection thereby, testified to thirty-five cases.
The rule is stated in Huff v. Bennett (6 N. Y. 339), that a witness may be permitted to refresh and assist his memory by the use of any written instrument, memorandum, or entry, and that it is not necessary *319 that such writing should have been made by himself, provided he can speak from his recollection, after inspecting the paper.
The same objection is taken to the evidence of the witness Grill, who had carted the freight, but could not remember the number of cases without reference to his bill, by that he could. He was presented the bill, and asked to refresh his memory, having done so he testified as to the quantity. Of the same character is the exception taken to the evidence given by the witness Snow, with whom a portion of the plaintiff’s merchandise was stored. The witness could not testify to the number of cases without reference to his books. He was allowed to refresh his memory by one of his bills, made out for storage taken from his books.
Hone of these exceptions are well taken (Howland v. Willetts, 5 Sand. 219).
Eighteen duplicate receipts of cargo, with the signature of the mate Hobson upon the same, were admitted as evidence. Hobson identifying his signature thereto, the evidence elsewhere showing that duplicates had been given. Hobson only signed for such packages as he received, they were then entered into the cargo book. The receipts when given were compared with the cargo book, which was lost with the vessel.
The court allowed the receipts as evidence of the receipt of the cases, but not of the contents. The receipts given at the time of the loading of the vessel, are a part of the transaction, and within the limits prescribed by the judge, are evidence. The general statement of the plaintiff that he had the goods put on board the vessel for the purpose of forwarding them to Mexico, was not evidence of the actual shipment of the goods, nor was it accepted, or relied on as such.
Defendants were in no manner prejudiced by such .general statement, as there was evidence afterwards given of the receipt of the merchandise on board.
*320 There was no error in allowing the witness Grill tosíate how many cases his cart would carry; although neither conclusive, or material, the evidence was not intrinsically improper.
When the counsel for the plaintiff offered to read in evidence the testimony of the witness B. F. Mullen, the counsel for the defendants objected on the ground that the proof preliminary to its admission was insufficient, and also on the ground that the witness had refused to-answer numerous questions on cross-examination.
The objections were overruled, and the defendants’' counsel excepted. The whole deposition was then read, and the counsel for defendants moved to strike out the deposition by reason of the refusal of the witness to* answer such questions.
The motion was denied, and the defendants’ counsel excepted.
The witness was a resident of the State of Indiana, and being in New York and expecting to leave the State, had been examined de bene esse.
Before the deposition was offered, it was proved on; the trial on the part of the plaintiff, that the witness-was not in this State.
When last heard from he was in the city of Washington. Plaintiff testified that he desired his attendance on'the trial, but that the witness could not come. Being a non-resident, his attendance could not be enforced. We think the preliminary proof was sufficient to justify the judge to admit the reading of the deposition (Markoe v. Aldrich, 1 Abb. Pr. 55; Nixon v. Palmer, 10 Barb. 175 ; Donnell v. Walsh, 6 Bosw. 621).
There does not appear to have been any objection made, at the time of the examination of the witness, to* his refusal to answer, nor were any steps taken before the examination was closed to compel an answer, which could have been done if the refusal was improper, nor-was any objection made to the filing of the deposition^
*321 A refusal to answer proper questions put to him on ' the cross-examination might have afforded good grounds to suppress the deposition if the motion had been made before the trial.
The deposition was taken in April, 1869, and was-offered on the trial in February, 1870.
A party should not be allowed to hold in reserve for the trial an objection of this character, by which the-other side would be surprised, and if allowed, would lose the benefit of the evidence of the witness (Kimball v. Davis, 19 Wend. 437; Zellweger v. Caffe, 5 Duer, 87-100).
The conduct of the witness upon the examination,, would affect his credibility with the jury, and their attention was particularly called by the judge to his refusal to answer these questions, as bearing upon his credibility.
The objection to the evidence on the cross-examination of the defendants’ witness, McGowan, as to what it would have cost to make guns, was not taken until, after the evidence had been received. To have been available, the objection should have been to the question. A party can not allow a question to a witness to be put and answered, and then if dissatisfied with the answer, if a proper response to the question, object to its competency as evidence. But the evidence under all the facts we do not consider wholly incompetent.
All the exceptions taken by the learned counsel for the defendants’ on the trial, have received that careful consideration which the case demands, as well on account of the importance of the questions involved, the nature of the case, and the amount in controversy, as the able and earnest manner in which they have been urged upon the court by the learned counsel for the defendants, and there has been discovered no such *322 error in the proceedings as would justify upon principle or authority, the reversal of the judgment.
But as the complete disposition of the case involves • the consideration of the appeal taken from the order • made by the learned judge on the trial, denying the motion for a new trial, on the minutes, we should look ■at. the whole case, so as to determine whether the evidence be sufficient to support the verdict.
The defendants’ case, as already mentioned, and as appears from the answer and proofs, involves the . ■concoction of a scheme by the plaintiff, with the master of the vessel, and others, to defraud the defendants out of the sum insured. ' It includes the selection^ of an unseaworthy vessel, the loading of her with merchandise of inconsiderable value, with reference to the large amount insured, the fraudulent overvaluation of the same, and a design from the beginning to have the , vessel and cargo lost, or abandoned to destruction. Together with other evidence of such original fraudu- , lent intention, it was Shown that a boat was shipped on the vessel, with sails and ballast, to afford a ready and -convenient means of escape to the captain and crew, so soon as the vessel should be abandoned. Evidence was introduced by the defendants, upon which reliance was placed, as tending to establish this fraudulent scheme in all its details.
On the other hand, there was evidence tending to show that the plaintiff, before taking a charter of the vessel, and in the month of August, had called upon other underwriters, with whom he subsequently in- ■ ■sured, to ascertain whether they would cover goods by the Keese ; and that not until he was so assured, did he take the charter.
That the vessel was rated by the agent of the defendants before they agreed to insure. That the vessel was lying at the dock, in the city of New York, open to examination, and some ten days were spent.in load *323 ing her. There was evidence given of the loading, and of the character, price paid for, and invoice-value of the merchandise. The policy of insurance was shown to he a valued one. The shipping of the small boat and ballast was accounted for by the evidence of the owner and shipper, who was sworn as a witness, and testified that he had shipped the same for sale at Vera Cruz, the reasons for the shipping being stated by him. The positive evidence of the fraudulent abandonment of the vessel while she was still afloat, and, as is ■claimed, could have reached Vera Cruz in safety, is furnished by certain seamen, who had, as already noticed, on the day of their arrival at Vera Cruz, signed and sworn to a protest, stating that they, with -others of the ship’s company, used their utmost -endeavors to preserve the vessel and cargo from loss, and that they left her, with the boat, when they were completely exhausted by efforts to save her through pumping, and when all means were unavailing to remedy the ship’s desperate situation. That the ship, before she had commenced to make water, had suffered heavy squalls and winds, during which her false keel had started amidship. That fresh gales and heavy seas caused her to leak, and led to the disaster.
The protest of these witnesses, as to the wind and •seas at the time of the disaster, is corroborated by the evidence of the vice-consul at Vera Cruz, who states that, for several days before the arrival of the master and crew in the boat, a strong wind from the north had prevailed, with a rough sea. All these questions were ■for the consideration and determination of the jury. It was their duty to weigh and judge the evidence on all the points involved. The jury were to determine whether the fraudulent scheme, alleged to have been entered into to defraud the underwriters, was established by the facts and circumstances.
The decision of the jury would involve the amount *324 of confidence and credibility to be placed in each of the witnesses, and the truthfulness and value of their statements. The appearance and manner of the witnesses examined on the trial would aid them in forming a reliable conclusion.
It was properly before the jury to determine whether the goods in question had been placed on the. vessel, and whether or not the plaintiff was the owner, or had an insurable interest therein, and its extent,, and whether or not there had been an overvaluation of the merchandise, and its “invoice value” overstated;. and ii so, whether it was intentionally excessive, and. fraudulent. ■
Questions of fraud, and the facts and circumstances of suspicion which tend to establish its existence, are eminently proper for the consideration and determination of a jury.
In Seward v. Jackson, in the court of errors (8 Cow. 435), Spencer, Senator, says: “Fraud or no fraud is. and ever must be a fact. The evidence of it may be so strong as to be conclusive, but still it is evidence, and as such, must be submitted to a jury. Ho court can. draw it against the finding of the jury.” In Jackson v. Timmerman (7 Wend. 438), Sutherland, J., cites-Seward v. Jackson, and the doctrine above announced with approval.
But as a general statement, this dictum is not. always followed, nor regarded as universally true in. judicial proceedings. The court does exercise the right to declare a transaction fraudulent, and will so instruct the jury when it is clearly established by uncontradicted evidence.
The jury has decided all the questions involved in favor of the plaintiff by the verdict. It is not the-province of the court to disturb the verdict, if the evidence is conflicting, and sufficient to uphold it, which appears to be the case, and this, although the court *325 might come to a different conclusion upon the facts from that attained by the jury.
The charge of the learned judge, clearly and explicitly placed the whole matter before the jury, in all its details. It is difficult to see how a charge more favorable to the defendant could have been reasonably made upon the questions involved.
There was but small room for complaint in this regard. To set aside this verdict would be to substitute the judgment of the court upon the facts, in the place of the solemn verdict of the jury, to whose determination they were submitted.
The judgment and order appealed from, is affirmed, with costs.
Sedgwick and Speib, JJ., concurred.